OPINION
On June 26, 2000, Cathy Perry and her husband, Michael Perry, filed a complaint in the Franklin County Court of Common Pleas against Speedway SuperAmerica LLC ("Speedway"), setting forth claims of intentional infliction of emotional distress and loss of consortium. Ms. Perry had been employed as a cashier at a Speedway store in Hilliard, Ohio. Ms. Perry was working the third shift in the early morning hours of June 28, 1999. Ms. Perry was outside the store taking a break when a person approached her from behind the store, pointed a gun at her and ordered her back into the store. Ms. Perry gave the robber all the money in the cash registers, and the robber left. Ms. Perry averred that she suffered severe emotional distress as a result of the robbery and for a variety of reasons, she alleged that Speedway's actions were the cause of her severe emotional distress. Mr. Perry set forth a claim for loss of services and consortium.
On April 2, 2001, Speedway filed a motion for summary judgment. The Perrys filed a memorandum contra, and Speedway filed a reply.
On June 27, 2001, the trial court filed a decision granting Speedway's motion for summary judgment. A judgment entry was journalized. The Perrys (hereinafter "appellants") have appealed to this court, assigning the following errors for our consideration:
 1. THE TRIAL COURT ERRED IN DETERMINING THAT THERE WAS NOT A GENUINE ISSUE OF MATERIAL FACT IN RELATION TO PLAINTIFF-APPELLANT, CATHY PERRY'S, CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND PLAINTIFF-APPELLANT, MICHAEL PERRY'S DERIVATIVE CLAIM FOR LOSS OF CONSORTIUM.
 2. THE TRIAL COURT ERRED IN FINDING THAT THE PLAINTIFFS-APPELLANTS HAD FAILED TO PROVE THAT THE DEFENDANT-APPELLEE KNEW OR SHOULD HAVE KNOWN ITS ACTIONS WOULD RESULT IN SERIOUS EMOTIONAL DISTRESS.
 3. THE TRIAL COURT ERRED IN FINDING THAT THE PLAINTIFFS-APPELLANTS HAD FAILED TO PROVE THAT THE ACTIONS OF THE DEFENDANT-APPELLEE WERE EXTREME AND OUTRAGEOUS.
Appellants' assignments of error are interrelated and will be addressed together. Appellants contend the trial court erred in granting summary judgment in favor of Speedway (hereinafter "appellee"). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370, citing Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, paragraph three of the syllabus. Our review of the appropriateness of summary judgment is de novo. See Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35. For the most part, the parties do not dispute the material facts and to that end, any disputed fact will be construed in favor of appellants. Rather, the main issue in the case at bar is whether under the facts, appellants are entitled to judgment as a matter of law, i.e., whether appellants have set forth a claim for intentional infliction of emotional distress.
In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant intended to cause the plaintiff serious emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) defendant's conduct was extreme and outrageous; that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; (3) the defendant's conduct was the proximate cause of plaintiff's serious emotional distress; and (4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could endure it. See Phung v. Waste Mgt., Inc. (1994), 71 Ohio St.3d 408, 410; Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374-375; and Cochran v. Columbia Gas of Ohio, Inc. (2000), 138 Ohio App.3d 888, 896.
We note that the parties, particularly appellee, rely on Mitchell v. Lawson Milk Co. (1988), 40 Ohio St.3d 190, and Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, and numerous cases citing thereto, for the definition of "intent" in intentional tort claims against employers by their employees. These cases stem originally from Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100 . However, such cases have not been extended to claims against employers solely for intentional infliction of emotional distress. Indeed, in Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486, 495, the Supreme Court stated that it had never applied Van Fossen and its progeny to purely emotional injuries which have psychological but no physical consequences. Hence, the definition of intent as set forth in Fyffe and its progeny is not applicable to the claim herein, which is solely for intentional infliction of emotional distress.
Appellants' arguments go only to the first and second elements of a claim for intentional infliction of emotional distress, as these were the bases for the trial court's decision. Appellants assert there are genuine issues as to the first element in that appellee knew or should have known that its actions would result in Ms. Perry suffering severe emotional distress. Appellants point to evidence that Ms. Perry was not properly trained on how to handle a robbery or how to activate the panic button in the store, that appellee failed to follow its policy of always having two people on a shift and that the store was in a high crime area. As to the second element, appellants assert, in essence, that such actions constituted extreme and outrageous behavior. After independently reviewing the evidence and construing such in favor of appellants, we determine that appellants set forth no genuine issue of material fact and that the facts, applied to the elements, do not entitle appellants to judgment as a matter of law.
Ms. Perry was hired by appellee on January 13, 1999. (Cathy Perry depo. at 30; Cathy Perry affidavit.) Ms. Perry requested to work the third shift (10 p.m. to 6 a.m.) so that she could be home with her children during the day. (Cathy Perry depo. at 45; Cathy Perry affidavit.) Ms. Perry was told that there would always be two people working the third shift unless there was an emergency. (Cathy Perry depo. at 44; Cathy Perry affidavit.) Ms. Perry did not receive the scheduled training because her children's school had closed due to the weather and, instead, she trained while on the job. (Cathy Perry depo. at 58-59, 60.)
Ms. Perry stated that she was given no training on the procedure to follow during a robbery. (Cathy Perry affidavit.) Ms. Perry asked several employees, including an assistant manager, about the procedure to follow in case of a robbery. (Cathy Perry depo. at 50-51; Cathy Perry affidavit.) Ms. Perry was told to cooperate with the robber, give the robber anything they ask for, and push the panic button. (Cathy Perry depo. at 51-52, 55, 57, 72-73.) Ms. Perry was shown where the panic button was, but she was never instructed on how to actually activate it. (Cathy Perry depo. at 52; Cathy Perry affidavit.) As for when to push the button during a robbery, Ms. Perry assumed that she should push the button when she could "get away with it." (Cathy Perry depo. at 52.) Ms. Perry was told by an assistant manager that places in Hilliard did not get robbed. Id. at 51.
Prior to the robbery, appellant was left alone on the third shift one to two times per week because the second employee would be scheduled to leave early. (Cathy Perry affidavit.) Ms. Perry had complained about this, and she was told there were not enough employees. (Cathy Perry depo. at 89-90; Cathy Perry affidavit.) Ms. Perry never considered leaving her job over this issue as she could not leave for financial reasons. (Cathy Perry depo. at 91; Cathy Perry affidavit.)
Ben Alexander, another employee at the same store, stated that prior to Speedway merging with SuperAmerica, the policy was that no one was left alone on any shift. (Alexander depo. at 27.) Mr. Alexander complained to management about people being left alone, and he was told this was no longer the policy after the merger. Id. at 25, 28-30. The merger occurred prior to appellant's hiring. (Gerald J. Wagner affidavit.) Ruth Yarber stated that when she became manager in February 1999, there was no policy regarding the number of people that must be on during any shift. (Yarber depo. at 21-22.) Susan Short, the district manager, stated that there was no policy that two people be on the third shift and that the number of people on shifts depended on what was needed. (Short depo. at 21, 29.)
On June 28, 1999, appellant was working the third shift. The other employee left, as scheduled, at 3 a.m. (Cathy Perry depo. at 107; Cathy Perry affidavit.) Ms. Perry was outside smoking when an individual with a gun approached her, pointed the gun at her, and told her to get back in the store. (Cathy Perry depo. at 101-102; Cathy Perry affidavit.) The individual shoved the gun in Ms. Perry's back. (Cathy Perry depo. at 102.) Ms. Perry could not remember how to get one of the cash registers open, and the robber threatened that if she did not open it, he would shoot her. (Cathy Perry depo. at 102; Cathy Perry affidavit.) The robber started counting, and Ms. Perry testified that she was "really scared." (Cathy Perry depo. at 103.) The robber got the money, told Ms. Perry to calm down and ran out of the store. Id. at 103.
Ms. Perry then tried to activate the panic button, but it did not work/would not move. (Cathy Perry depo. at 103; Cathy Perry affidavit.) She felt vulnerable and like no one was coming to help her. (Cathy Perry depo. at 130; Cathy Perry affidavit.) So Ms. Perry locked the doors and called 9-1-1. (Cathy Perry depo. at 103.) The police got there "real quick." Id. at 104.
Ms. Perry was unable to get out of bed for approximately one week after the robbery, she threw up "all the time" for a couple of weeks, could not sleep for a month and initially she suffered from nightmares . (Cathy Perry depo. at 121, 123, 144; Cathy Perry affidavit.) Ms. Perry saw her family doctor the day of the robbery, and he gave her prescriptions to "settle" her down and help her sleep. (Cathy Perry depo. at 112-114.) He referred her to a counselor whom she saw for a couple of weeks, and he diagnosed her with having post-traumatic stress disorder. (Cathy Perry depo. at 114-115; Cathy Perry affidavit.) Ms. Perry also saw a psychiatrist, who prescribed Paxil. (Cathy Perry depo. at 116-117; Cathy Perry affidavit.) The psychiatrist diagnosed her as having post-traumatic stress disorder, major depression and acute panic disorder with agoraphobia. (Cathy Perry affidavit.)
Ms. Perry attempted to go back to work the following night, but it was "absolutely horrible." (Cathy Perry depo. at 122.) That was the last time Ms. Perry worked at the store. Id. at 123. After the robbery, it was very difficult for Ms. Perry to go out of the house, and she was unable to go out of the house at night at all because it was "too scary." (Cathy Perry depo. at 143; Cathy Perry affidavit.) Ms. Perry stated that that the robbery "changed everything." (Cathy Perry depo. at 123.) She could not stand going outside anymore; she could not take her kids to school or go to the grocery store, and her husband had to do everything. Id. at 123-124. She had been out at night only three times since the robbery. Id. at 124. Ms. Perry did obtain other employment at a grocery store working during the day. Id. at 137-138, 141.
Ms. Perry was mad that "that kid" (the robber) had taken her peace of mind. Id. She was also mad at Ms. Yarber because Ms. Yarber had shown everyone in the store the tape of the robbery, and Ms. Yarber thought it was funny how much Ms. Perry was shaking during the robbery. Id. at 124-125. After the robbery, Ms. Perry felt like appellee did not care whether or not she was robbed — that she was only a cashier and was "expendable." (Cathy Perry depo. at 127; Cathy Perry affidavit.) She imagined that "a lot of that has to do with Ruth, her showing the tape and laughing about it." (Cathy Perry depo. at 127.)
Ms. Perry stated that appellee should have trained her how to activate the panic button. Id. at 127. Ms. Perry thought that the panic button was not working, and she was subsequently shown that merely pushing the button did not activate it and that there was a certain way to activate it. Id. at 127-128. Ms. Perry stated that she should have been trained better on how to handle a robbery and should have been told how likely it was to have a robbery. Id. at 128-129. She felt like she should have been warned — not told that robberies did not occur in Hilliard — so that she could have made her own decision on whether to "put [herself] on the line like that." Id. at 129. Had she known then what she knows now, she does not think she would have worked there. Id.
Ms. Perry felt she had followed the proper procedure for handling a robbery and had done "very well." Id. at 134-135. Mr. Alexander told Ms. Perry that she had done everything right but that she should not have been alone. (Alexander depo. at 35.) Appellee's policy on how to handle a robbery stated that the panic button should be activated after the robber has left. Ms. Perry stated that knowing how to activate the panic button would not have prevented her "from going through the robbery," and she did not know what would have been different had she known how to activate the button. (Cathy Perry depo. at 130, 134.)
The above facts, construed most strongly in favor of appellants, do not raise issues as to the claim for intentional infliction of emotional distress. It simply cannot be said by any stretch that appellee knew or should have known that its failure to inform Ms. Perry of exactly how to activate the panic button would result in Ms. Perry suffering severe emotional distress. This failure simply does not rise to actionable, intentional behavior as defined in the case law. Ms. Perry herself stated that she did not know if anything would have been different had she known how to activate the panic button. Indeed, but for being able to activate the panic button, Ms. Perry followed appellee's written policy exactly.
The same can be said for appellee's failure to have a second person work the entire third shift. Appellants simply have not shown that appellee knew or should have known that the absence of a second person on third shift during a robbery would cause Ms. Perry severe emotional distress. In addition, there is no evidence that this was a "high crime area" as asserted by appellants. The store had never been robbed prior to June 28, 1999.
We note that appellants have not averred that appellee is responsible for the robbery itself. Rather, appellants claim that in failing to train on the use of the panic button, in failing to have an additional person working during the entire third shift and in creating a false sense of security, appellee knew or should have known that Ms. Perry would suffer severe emotional distress after a robbery. There is simply no basis for this contention both factually and legally. Ms. Perry herself was aware of the potential for a robbery and therefore inquired about the procedure to follow in case of a robbery. She followed this procedure during the robbery. On a weekly basis, Ms. Perry worked alone during part of her shift, and she chose to continue working despite this knowledge.
The robbery no doubt caused Ms. Perry distress, as it would anyone. However, appellants have not asserted that appellee actually caused or contributed to the robbery itself. The parties have not focused their arguments on the causation element. Notwithstanding this, there is no evidence that appellee's actions caused the robbery which in turn caused Ms. Perry to suffer severe emotional distress. Rather, appellants' case focuses on certain actions by appellee that allegedly caused Ms. Perry to suffer emotional distress. However, the facts, construed most strongly in favor of appellants, do not raise a genuine issue that appellee's actions caused Ms. Perry's distress. Certainly, as to the first element, appellee's actions were not such that it knew or should have known that such actions would result in Ms. Perry suffering severe emotional distress.
Even if we determined, for the sake of argument only, that appellee knew or should have known that its actions would result in Ms. Perry suffering severe emotional distress, appellants have not created a genuine issue of fact as to the second element. Appellee's actions in failing to train Ms. Perry on how to activate the panic button and in not scheduling two people to work the entire third shift do not constitute extreme and outrageous behavior. As stated above, to constitute extreme and outrageous behavior, the actions must go beyond all possible bounds of decency and can be considered as utterly intolerable in a civilized community. The conduct of which appellants complain simply does not meet this definition.
Because appellants have not raised genuine issues of material fact as to the first, second and third elements of intentional infliction of emotional distress, summary judgment in favor of appellee was appropriate. It follows that Mr. Perry's derivative claim for loss of consortium was appropriately disposed of by way of summary judgment. For all of these reasons, appellants' assignments of error are overruled.
Having overruled each of appellants' assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
LAZARUS and PETREE, JJ., concur.