**[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 367.]**

ZIVICH ET AL., APPELLANTS, *v.* MENTOR SOCCER CLUB, INC., APPELLEE, ET AL.

[Cite as *Zivich v. Mentor Soccer Club, Inc.*, 1998-Ohio-389.]

*Torts—Negligence—Parents have authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence— Agreements may not be disaffirmed by the child on whose behalf they were executed—Parents may release own claim arising out of injury to their minor children.*

1.  Parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed.

2.  Parents may release their own claims arising out of injury to their minor children.

(No. 97-1128—Submitted April 21, 1998—Decided June 29, 1998.)

APPEAL from the Court of Appeals for Lake County, No. 95-L-184.

————————————

{¶ 1} In May 1993, appellant Pamela Zivich registered her seven-year-old son, appellant Bryan Zivich, for soccer with Mentor Soccer Club, Inc. ("Club"), appellee, for the 1993-1994 season. The Club is a nonprofit organization that provides children in the greater Mentor area with the opportunity to learn and play soccer. The Club is primarily composed of parents and other volunteers who provide their time and talents to help fulfill the Club's mission. The Club's registration form, signed by Mrs. Zivich, contained the following language:

"Recognizing the possibility of physical injury associated with soccer and for the Mentor Soccer Club, and the USYSA [United States Youth Soccer

Association] accepting the registrant for its soccer programs and activities, I hereby release, discharge and/or otherwise indemnify the Mentor Soccer Club and the USYSA, its affiliated organizations and sponsors, their employees, and associated personnel, including the owners of the fields and facilities utilized by the Soccer Club, against any claim by or on behalf of the registrant as a result of the registrant's participation in the Soccer Club * * *."

{¶ 2} On October 7, 1993, Bryan attended soccer practice. During practice, the boys participated in an intrasquad scrimmage. Bryan's team won. After the scrimmage, Bryan ran to his father, who was standing on the sidelines and talking with the coach. Excited about the win, Bryan, unsupervised, jumped on the goal and swung back and forth on it. The goal, which was not anchored down, tipped backward. Bryan fell, and the goal came down on his chest, breaking three of his ribs and collarbone, and severely bruising his lungs.

{¶ 3} In January 1995, Bryan's parents, Philip and Pamela Zivich, appellants, sued the Club[1] for injuries sustained by Bryan. The complaint alleged negligence and reckless misconduct.[2] The Club moved for summary judgment on the ground that the release executed by Bryan's mother barred the claims. The trial court agreed and granted the Club's summary judgment motion.

{¶ 4} The court of appeals affirmed, albeit partly on different grounds. In Judge Nader's majority opinion, in which Judge Christley "reluctantly" joined, he said that the exculpatory agreement was effective against Mr. and Mrs. Zivich, but not against Bryan. Thus, while the trial court was correct to grant summary judgment, Bryan still had a cause of action which a guardian could bring on his behalf or which he could assert once he gained the age of majority. Judge Nader

---

1. Appellants also sued the city of Mentor, which owned the park where practice was held. The city settled with appellants, and this court dismissed it from the lawsuit in December 1997. 80 Ohio St.3d 1474, 687 N.E.2d 471.
2. Other claims were asserted, but they are not at issue here.

acknowledged the public policy in favor of enforcing the agreement against Bryan, but found that that decision was best left to the General Assembly or this court. Additionally, Judge Nader's majority opinion found no evidence to support the willful and wanton misconduct claim. Concurring in the result only, Judge Ford opined that the public policy of Ohio favors enforcement of the agreement against Bryan as well as his parents. Judge Christley "wholehearted[ly] endorse[d]" the policy advocated by Judge Ford, but agreed with Judge Nader that the issue should be resolved by the General Assembly or this court.

{¶ 5} The cause is now before this court pursuant to the allowance of a discretionary appeal.

––––––––––––––––

*Svete, McGee & Carrabine Co., L.P.A.,* and *James W. Reardon*, for appellants.

*Reminger & Reminger Co., L.P.A., George S. Coakley*, *Laura M. Sullivan* and *Brian D. Sullivan*, for appellee.

––––––––––––––––

**FRANCIS E. SWEENEY, SR., J.**

{¶ 6} We are asked to decide whether the exculpatory agreement[3] executed by Mrs. Zivich on behalf of her minor son released the Club from liability for the minor child's claims and the parents' claims as a matter of law. We find that the exculpatory agreement is valid as to all claims. Summary judgment was appropriately entered in the Club's favor. The judgment of the court of appeals is affirmed.

––––––––––––––––––––––––––––––

3. The words "release," "waiver" and "exculpatory agreement" have been used interchangeably by the courts. These defenses are based on contract principles. "Exculpatory agreements, also called 'releases' or 'waivers,' are basically written documents in which one party agrees to release, or 'exculpate,' another from potential tort liability for future conduct covered in the agreement." King, Exculpatory Agreements for Volunteers in Youth Activities—The Alternative to "Nerf" Tiddlywinks (1992), 53 Ohio St. L.J. 683.

**{¶ 7}** Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.

**{¶ 8}** Appellants argue that since practice had concluded, the injury occurred outside the scope of the exculpatory agreement. We find this contention meritless. We quote, with approval, Judge Nader's majority opinion rejecting this argument: "It should not come as any great surprise for a parent to learn that, during a period of inactivity at a soccer practice, his or her child fiddled with loose equipment, climbed on nearby bleachers, or scaled the goal. It should be equally clear that coaches supervising the practices will not be able to completely prevent such unauthorized activity, as some degree of bedlam is unavoidable, when children of tender years are brought together to play a game, and when their emotions are aroused. The risk of a seven[-]year[-]old child climbing on a goal shortly after winning an intrasquad scrimmage is, therefore, a natural incident of his participation in soccer practice. Thus, Bryan's injuries fall within the ambit of the release."

**{¶ 9}** We next consider whether the release is valid. With respect to adult participants, the general rule is that releases from liability for injuries caused by negligent acts arising in the context of recreational activities are enforceable. *Bowen v. Kil-Kare, Inc.* (1992), 63 Ohio St.3d 84, 90, 585 N.E.2d 384, 390; *Simmons v. Am. Motorcyclist Assn., Inc.* (1990), 69 Ohio App.3d 844, 846, 591

N.E.2d 1322, 1324; *Cain v. Cleveland Parachute Training Ctr.* (1983), 9 Ohio App.3d 27, 9 OBR 28, 457 N.E.2d 1185. These holdings recognize the importance of individual autonomy and freedom of contract. Here, however, the exculpatory agreement was executed by a parent on behalf of the minor child.

{¶ 10} Appellants contend that the release is invalid on public policy grounds. In support of their argument, they refer to the general principle that contracts entered into by a minor, unless for "necessaries," are voidable by the minor, once the age of majority is reached, or shortly thereafter. Restatement of the Law 2d, Contracts (1979), Sections 7, 12, and 14, and Comment *f* to Section 12. Appellants urge us to apply the seminal case of *Wagenblast v. Odessa School Dist. No. 105-157-166J* (1988), 110 Wash.2d 845, 851-852, 758 P.2d 968, 971, where the Washington Supreme Court relied upon *Tunkl v. Regents of Univ. of California* (1963), 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, and set forth a six-part test to determine whether a particular release violates public policy. The Club, however, argues that the proper focus is not whether the release violates public policy but rather that public policy itself justifies the enforcement of this agreement. This is also the position advocated by Judge Ford in his concurring opinion. We agree with the Club and Judge Ford.[4]

{¶ 11} The General Assembly has enacted statutes designed to encourage landowners to open their land to public use for recreational activities without fear of liability. *Moss v. Dept. of Natural Resources* (1980), 62 Ohio St.2d 138, 142, 16 O.O.3d 161, 164, 404 N.E.2d 742, 745. See R.C. 1533.18 and 1533.181, which together provide that private entities that hold land open for recreational use without charge are immune from tort liability for any injury caused by a recreational user.

---

4. The majority opinion stated that an intermediate appellate court was not the appropriate forum to decide public policy. However, in a common-law system, a judicial decision declaring the rights of the parties can be based on several grounds, one of which is public policy. Hopkins, Public Policy and the Formation of a Rule of Law (1971), 37 Brooklyn L.Rev. 323, 330. Therefore, public policy is an appropriate device to be used by an appellate court to decide a case.

Then, in 1996, R.C. 2305.381 and 2305.382[5] were enacted, effective January 27, 1997. Together, these statutes accord qualified immunity to unpaid athletic coaches and sponsors of athletic events. Hence, the General Assembly has articulated its intent of encouraging the sponsorship of sports activities and protecting volunteers. However, R.C. 2305.381 and 2305.382 were enacted after this cause of action arose. Thus, our role is to render a decision that fills the gap left open before the effective date of the statutory enactments.

{¶ 12} It cannot be disputed that volunteers in community recreational activities serve an important function. Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. Children also are given the chance to exercise and develop coordination skills. Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost. In fact, the American Youth Soccer Organization pays only nineteen of its four hundred thousand staff members. The Little League pays only seventy of its 2.5 million members. See King, Exculpatory Agreements for Volunteers in Youth Activities—The Alternative to "Nerf" Tiddlywinks (1992), 53 Ohio St.L.J. 683, 759, fns. 208 and 209. Clearly, without the work of its volunteers, these nonprofit organizations could not exist, and scores of children would be without the benefit and enjoyment of organized sports. Yet the threat of liability strongly deters many individuals from volunteering for nonprofit organizations. Developments in the Law—Nonprofit Corporations—Special Treatment and Tort Law (1992), 105 Harv.L.Rev. 1667, 1682. Insurance for the organizations is not the answer, because individual volunteers may still find

_____

5. Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, 3931. Our statutory law is in line with the many "volunteer statutes" passed by other states. See McCaskey and Biedzynski, A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries (1996), 6 Seton Hall J. of Sport L. 7, 62-63 (citing statutes).

themselves potentially liable when an injury occurs. Markoff, Liability Threat Looms: A Volunteer's Thankless Task (Sept. 19, 1988), 11 Natl.L.J. 1, 40. Thus, although volunteers offer their services without receiving any financial return, they place their personal assets at risk. See Developments, *supra,* 105 Harv.L.Rev. at 1692.

**{¶ 13}** Therefore, faced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort. Hence, invalidation of exculpatory agreements would reduce the number of activities made possible through the uncompensated services of volunteers and their sponsoring organizations.

**{¶ 14}** Therefore, we conclude that although Bryan, like many children before him, gave up his right to sue for the negligent acts of others, the public as a whole received the benefit of these exculpatory agreements. Because of this agreement, the Club was able to offer affordable recreation and to continue to do so without the risks and overwhelming costs of litigation. Bryan's parents agreed to shoulder the risk. Public policy does not forbid such an agreement. In fact, public policy supports it. See *Hohe v. San Diego Unified School Dist.* (1990), 224 Cal.App.3d 1559, 1564, 274 Cal.Rptr. 647, 649. Accordingly, we believe that public policy justifies giving parents authority to enter into these types of binding agreements on behalf of their minor children. We also believe that the enforcement of these agreements may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities. See King, *supra*, 53 Ohio St. L.J. at 709.

**{¶ 15}** Another related concern is the importance of parental authority. Judge Ford's concurring opinion also embraces this notion. Citing *In re Perales* (1977), 52 Ohio St.2d 89, 96, 6 O.O.3d 293, 296-297, 369 N.E.2d 1047, 1051, fn. 9; *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, 1171; and *State*

*ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 8, 15 O.O.3d 3, 4-5, 399 N.E.2d 66, 67, Judge Ford found that the right of a parent to raise his or her child is a natural right subject to the protections of due process. Additionally, parents have a fundamental liberty interest in the care, custody, and management of their offspring. Further, the existence of a fundamental, privacy-oriented right of personal choice in family matters has been recognized under the Due Process Clause by the United States Supreme Court. See *Meyer v. Nebraska* (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042; *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599.

{¶ 16} Based upon these protections, Judge Ford believes that many decisions made by parents "fall within the penumbra of parental authority, *e.g.,* the school that the child will attend, the religion that the child will practice, the medical care that the child will receive, and the manner in which the child will be disciplined." He found it notable that the law empowers a parent to consent to medical procedures for a minor child (R.C. 2317.54[C]), gives a parent the general authority to decide to decline medical treatment for the child, and destroys the child's cause of action for battery when consent is given. See *Lacey v. Laird* (1956), 166 Ohio St. 12, 19, 1 O.O.2d 158, 161, 139 N.E.2d 25, 30 (Hart, J., concurring). Thus, Judge Ford believes that invalidating the release as to the minor's claim is inconsistent with conferring other powers on parents to make important life choices for their children.

{¶ 17} Nor is it appropriate to equate a preinjury release with a postinjury release. As one commentator aptly explains:

"The concerns underlying the judiciary's reluctance to allow parents to dispose of a child's existing claim do not arise in the situation where a parent waives a child's future claim. A parent dealing with an existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child's ultimate best interests.

"A parent who signs a release before her child participates in a recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release.

"A parent who dishonestly or maliciously signs a preinjury release in deliberate derogation of his child's best interests also seems unlikely. Presumably parents sign future releases to enable their children to participate in activities that the parents and children believe will be fun or educational. Common sense suggests that while a parent might misjudge or act carelessly in signing a release, he would have no reason to sign with malice aforethought.

"Moreover, parents are less vulnerable to coercion and fraud in a preinjury setting. A parent who contemplates signing a release as a prerequisite to her child's participation in some activity faces none of the emotional trauma and financial pressures that may arise with an existing claim. That parent has time to examine the release, consider its terms, and explore possible alternatives. A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue." Purdy, *Scott v. Pacific West Mountain Resort:* Erroneously Invalidating Parental Releases of a Minor's Future Claim (1993), 68 Wash.L.Rev. 457, 474.

**{¶ 18}** These comments were made in a law review article criticizing the Washington Supreme Court's decision in *Scott v. Pacific W. Mountain Resort* (1992), 119 Wash.2d 484, 834 P.2d 6. In that case, the court found that a release, signed by the mother so that her son could take ski-racing lessons, was invalid as to the minor's claim. In *Scott*, the court had reasoned that it made no sense to treat a child's preinjury and postinjury property rights differently. *Id.* at 494, 834 P.2d at 11-12. The article criticized this decision, noting that when the mother signed

the release, she gave her son the opportunity to ski. She gained no financial advantage for herself, nor did she suffer from fraud or collusion. She was under no financial or emotional pressure when she signed. The article states that "while she may have misjudged the risk to her son, Mrs. Scott did not mismanage or misappropriate Justin's property. She did her best to protect Justin's interests, and the court need not step in to do so." *Id.,* 68 Wash.L.Rev. at 474-475.

{¶ 19} We agree with Judge Ford's concurring opinion and the reasoning contained in the foregoing law review article. When Mrs. Zivich signed the release she did so because she wanted Bryan to play soccer. She made an important family decision and she assumed the risk of physical injury on behalf of her child and the financial risk on behalf of the family as a whole. Thus, her decision to release a volunteer on behalf of her child simply shifted the cost of injury to the parents. Apparently, she made a decision that the benefits to her child outweighed the risk of physical injury. Mrs. Zivich did her best to protect Bryan's interests and we will not disturb her judgment. In fact, the situation is more analogous to Ohio's informed consent law than to the law governing children's property rights. See R.C. 2317.54(C), which gives parents the authority to consent to medical procedures on a child's behalf. In both cases, the parent weighs the risks of physical injury to the child and the attendant costs to herself against the benefits of a particular activity.

{¶ 20} Therefore, we hold that parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed.

{¶ 21} Having upheld the release agreement against Bryan's claims, we find it also valid as to Mr. and Mrs. Zivich's claims for loss of consortium. Mrs. Zivich, the signatory on the agreement, acknowledged that she had read its contents and did not ask any questions about them. Parents may release their own claims growing out of injury to their minor children. See, *e.g.*, *Simmons v. Parkette Natl.*

*Gymnastic Training Ctr.* (E.D.Pa.1987), 670 F.Supp. 140, 142; *Childress v. Madison Cty.* (Tenn.App.1989), 777 S.W.2d 1, 6; *Scott, supra,* 119 Wash.2d 484, 834 P.2d 6. We adopt this rule of law, finding it consistent with principles of freedom of contract. Thus, we hold that parents may release their own claims arising out of the injury to their minor children. Accordingly, we find that Mrs. Zivich is barred from recovery as to her claims.

{¶ 22} We further find that Philip Zivich's[6] loss of consortium claim is also barred as a matter of law. Although Mr. Zivich did not personally sign the release agreement, he accepted and enjoyed the benefits of the contract. In fact, when the injury occurred, Mr. Zivich was the parent who was at the practice field that evening. Thus, Mr. Zivich's conduct conveys an intention to enjoy the benefits of his wife's agreement and be bound by it. Under the doctrine of estoppel by acquiescence, Mr. Zivich may not assert his rights against the Club. *Natl. Football League v. Rondor, Inc.* (N.D.Ohio 1993), 840 F.Supp. 1160, 1167.

{¶ 23} As a separate ground for recovery, appellants also contend that the injury was caused by the Club's willful and wanton misconduct. In *McKinney v. Hartz & Restle Realtors, Inc.* (1987), 31 Ohio St.3d 244, 246, 31 OBR 449, 451, 510 N.E.2d 386, 388-389, this court defined "willful" misconduct as conduct involving " 'an intent, purpose or design to injure.' " *Id.*, quoting *Denzer v. Terpstra* (1934), 129 Ohio St. 1, 1 O.O. 303, 193 N.E. 647, paragraph two of the syllabus. "Wanton" misconduct was defined as conduct where one " 'fails to exercise any care whatsoever toward those to whom he owes a duty of care, and [t]his failure occurs under circumstances in which there is a great probability that harm will result.' " *McKinney*, 31 Ohio St.3d at 246, 31 OBR at 451, 510 N.E.2d at 388-389, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363

---

6. In the court of appeals, Mr. Zivich also argued that summary judgment was improper as to his claim for negligent infliction of emotional distress. However, he does not raise this claim here. Accordingly, we do not address this issue.

N.E.2d 367, syllabus. We have held that while a participant in recreational activities can contract with the proprietor to relieve the proprietor from any damages or injuries he may negligently cause, the release is invalid as to willful and wanton misconduct. *Bowen, supra,* 63 Ohio St.3d at 90, 585 N.E.2d at 390.

{¶ 24} To support this claim, appellants assert that the Club's former president, David Bolsen, attended a seminar just before his term of office ended. It was at the seminar that he learned of the need to anchor the goals and to post warning labels on them. Bolsen testified that because his term expired two weeks later, he had time to relay the information only to a few persons. However, no action was taken to secure the goals.

{¶ 25} Appellants argue that Bolsen's failure to take more affirmative steps to ensure that the Club and the city implemented the safety recommendations amounts to willful and wanton misconduct. Like the court of appeals, we reject this argument.

{¶ 26} There is no evidence that the former president intended that Bryan should be injured. Nor did the former president utterly fail to exercise any care whatsoever. Even accepting as true the appellants' claim that club officials knew about the safety problems but failed to act, this action does not amount to willful and wanton misconduct. As noted by the appellate court, "Park officials testified that the City never had anchored the goals in the past, and, apparently, of the thousands of young boys and girls playing soccer in the youth league throughout the years, no other child had been injured in this manner." Thus, reasonable minds could not conclude that the risk posed by the unanchored goal was so great as to require immediate remedial action.

{¶ 27} Moreover, the evidence established that the city, not the Club, was responsible for the upkeep of the soccer fields and the purchase, storage, maintenance, and placement of the soccer goals.

{¶ 28} We find that appellants failed to produce sufficient evidence to present a jury question on the claim of willful and wanton misconduct.

{¶ 29} Accordingly, we affirm the court of appeals' judgment, albeit on somewhat different grounds. We uphold its decision that the release is valid as to the parents' claims. However, we hold that the release is also valid as to the minor child's claim.

*Judgment affirmed.*

MOYER, C.J., RESNICK, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS and PFEIFER, JJ., concur in judgment only.

———————————

**COOK, J., concurring.**

{¶ 30} I join in the well-reasoned majority opinion. I write separately only to point out that today's decision is firmly grounded in the public policy of the General Assembly, as evinced by the legislative enactments cited by the majority.

———————————