[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
The defendants Paul Rivest, USA Hockey, Inc., Connecticut Hockey Conference, Inc. and City of Norwich have moved for Summary Judgment on Counts One, Three, Four, Five and Six of the Complaint on the grounds that they are entitled to judgment as a matter of law.
Statement of Facts
In this action the minor plaintiff, Gabriel Fischer, and his father, Jerome Fischer, seek damages for injuries sustained by Gabriel Fischer during a hockey game on September 22, 1998 at an ice rink owned by the City of Norwich. On that date, Gabriel was playing for the Norwich Ice Breakers in a game against the Western Mass. Predators. The Norwich Ice Breakers was a member team of the Connecticut Hockey Conference and both teams were members of U.S.A. Hockey, Inc.
The plaintiff[1] alleges that as he "skated towards the front of the Western Mass. Predators' bench, the door in the boards was opened and the plaintiff was checked from behind or pushed by defendant, Richard Roe, into the corner of the open door." On October 9, 2001 the plaintiffs moved to substitute Gregory Haney of Ludlow, Massachusetts for Richard Roe. That motion was granted and service was made on Mr. Haney on November 29, 2001.
The accident occurred while the Western Massachusetts team was going for a line change. It is common for fresh players coming onto the ice to simply climb over the rail and jump onto the ice. It is also common for players coming off the ice during a line change to use the team door because they are usually tired and the line change is performed more quickly with them using the door. The incident occurred when Gabriel Fischer, who had just released the hockey puck down the ice towards the goal, was checked by Greg Haney, a team member from the Western Massachusetts Predators. As both the plaintiff and Haney had been skating in the general direction of the side of the rink, the plaintiff was checked and contacted the boards leading into the Western Massachusetts Predators' team box just as the door was opening for a line change.
The plaintiffs do not contest the foregoing. The defendants have also presented evidence that the contact between the plaintiff and the Western Massachusetts Predators' players was a "clean hit". Neither official at the hockey game called a penalty on the part of Greg Haney.
While the plaintiffs do not claim that a penalty was called on the Predators' player, Gregory Haney, they claim, essentially, that a penalty should have been called. The plaintiffs have presented the affidavit of Gabriel Fischer, which provides, in pertinent part:
 2. On September 20, 1998, I was playing hockey for the Ice Breakers Team associated with USA Hockey.
3. I was a substitute on the team and was 15 years old at the time. CT Page 10319
4. This was my second season with the Ice Breakers.
 5. Previously I played for the Sea Hawks team in the Southeastern Connecticut Youth Hockey League.
 6. The Sea Hawks was not as good a team as the Ice Breakers and the competition was not as good as with the Ice Breakers.
 7. I had hoped to play competitive hockey in college and understood that college Scouts would sometimes come to the Ice Breaker games.
 8. I had tried out for the Ice Breakers at the beginning of the 1997-1998 season and was accepted at age 14.
 9. In the game in which I was injured on September 20, 1998, I was in the opposite corner of the ice when the puck went toward the middle of the ice near the predators bench.
 10. I skated towards the puck into the middle of the ice near the boards by the Predator's bench.
 11. As I was skating toward the puck and the other team's bench, I was suddenly pushed from behind and I think I was pushed a second time as I was going down.
 12. I believe this is known as board checking or charging and is a violation of the Rules.
 13. The push was so sudden and hard that I was pushed into the corner of the open doorway to the opposing team's bench. My abdomen, which is not protected by pads, hit the exposed corner of the boards.
The injury to Gabriel Fischer resulted in the amputation of his leg.
The plaintiffs have presented no evidence of any specific rule violation by Haney, and do not contest the defendants' evidence that neither of the officials at the game found any violation of the rules or imposed a penalty on Haney. Rather, in their Memorandum in Opposition to Summary Judgment dated January 25, 2002, the plaintiffs' attorney states:
Gregory Haney performed an illegal hit, which constituted reckless behavior, unnecessarily rough play, and unsportsmanlike conduct, all of which are violations of the Rules. (Rule 601, 607 and 640, Official Rules of USA Hockey Ex.6) CT Page 10320
While the plaintiffs have referenced Rule 601, 607 and 640, they have presented only Rule 607 in their opposition to summary judgment. That Rule provides that certain penalties should be imposed on a player who body checks or pushes an opponent from behind.
The defendants have presented evidence, uncontested by the plaintiffs, that the facilities at the Norwich rink were in good condition and well maintained and the ice was well maintained and in good condition on the date of the accident. Neither Coach Rivest, his assistant coaches or players had experienced any trouble or noticed any problem associated with the subject door or door latching mechanism at any time prior to the moment of the plaintiff's injury.
The officials working the game, as well as the coach of the Massachusetts team, determined that the physical contact between the Massachusetts team player and the plaintiff was "clean" and within the rules of play. These determinations were made by individuals experienced with the rules of hockey. Andy Mann, one of the officials, has officiated hockey games for sixteen years. Mark Arriola has worked as an official with children's ice hockey teams for fifteen years, and has worked as a linesman officiating both high school and college hockey games for ten years. Paul Rivest has coached hockey since 1985.
In order to play in the USA Hockey program, the plaintiff was required to be a member of USA Hockey. The plaintiff had been a member of USA Hockey for eight consecutive seasons: 1990-91; 1991-92; 1992-93; 1993-94; 1994-95; 1995-96; 1996-97 and 1997-98. The plaintiff and his parent and/or guardian signed a waiver and release for each of these seasons. Both the plaintiff and his father, Jerome Fischer, signed a "Waiver of Liability, Release Assumption of Risk Indemnity Agreement" ("Waiver Release") on August 17, 1998 for the 1998-99 season. The plaintiffs admit that they signed the Waiver Release, which provided in pertinent part:
For and in consideration of participant's registration with USA Hockey, Inc. . . . and being allowed to participate in USAH events and member team activities, the parent(s) or legal guardian(s) of participants relinquish any and all liability for and cause of action for personal injury, property damage or wrongful death occurring to participant arising out of participation in USAH events, member team activities, the sport of ice hockey, and/or activities incidental thereto, whenever or however they occur . . . and by this agreement any such claims, rights, and CT Page 10321 causes of action that participant may have are hereby relinquished. . . .
 Participant and/or participant's parent(s)/guardian(s) acknowledge, understand and assume all risks inherent in ice hockey and any member team activities, and understand that said sport and activities involve risks to participant's person including bodily injury, partial or total disability, paralysis, and death, and damages which may arise therefrom and that I/we have full knowledge of said risks. These risks and dangers may be caused by the negligence of the participant or the negligence of others including the "releasees" identified below. It is further acknowledged that there may be risks and dangers not known to us or are not reasonable foreseeable at this time
 Participant and/or participant's parent(s)/guardian(s) acknowledge, understand and assume the risks, if any, arising from the conditions and use of ice hockey rinks and related premises and acknowledges and understands that included within the scope of this waiver and release is any cause of action arising from the performance, or failure to perform maintenance, inspection, supervision or control of said areas and for the failure to warn of dangerous conditions existing at said rinks, for negligent selection of certain releasees, or negligent supervision or instruction by releasees.
 It is the purpose of this agreement to exempt, waive and relieve releasees from liability for personal injury, property damage, and wrongful death caused by negligence, including the negligence, if any, of releasees. "Releasees" include USA Hockey, Inc., its Affiliate Associations, Local Associations, Member teams, event hosts, other participants, coaches, officials, sponsors, advertisers, owners and operators of the premises used to conduct any event and each of them, their officers, directors, agents and employees.
Participant and/or participant's parent(s)/guardian(s) acknowledge that they have been provided and have read the above paragraphs and have not relied upon any CT Page 10322 representations of releasees, that they are fully advised of the potential dangers of ice hockey and understand these waivers and releases are necessary to allow amateur ice hockey to exist in its present form
In Count One, the plaintiffs allege that the City of Norwich was negligent. Count
Two alleges that Richard Roe's(now Gregory Haney) actions were "done with reckless misconduct" in that:
a. he checked and pushed the plaintiff from behind;
b. he engaged in unnecessarily rough play;
 c. he checked and pushed the plaintiff from behind while the defendant team's door was open; and
d. he engaged in unsportsmanlike conduct.
Count Three is directed against Paul Rivest, the coach of the Western Mass.Predators team. The gravamen of the plaintiffs' claim against Coach Rivest is that he, as a participant coach in the game, acted negligently. There is no claim that Coach Rivest acted recklessly, willfully or wantonly.
In Counts Four and Five, the plaintiff alleges negligence by the defendants, USA Hockey, Inc. and Connecticut Hockey Conference. In Count Six, the plaintiff, Jerome Fischer, seeks to recover medical expenses he incurred in the care and treatment of his son, Gabriel Fischer.
Discussion of the Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,219 Conn. 772, 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co.,219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital,
CT Page 10323192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1978); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stam, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). Summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989).
The issue of the enforceability of an exculpatory contract such as the Waiver Release has not been considered by any appellate court in this state. However Appellate courts of other states have considered the issue. In Zivich v. Mentor Soccer Club, Inc., 696 N.E.2d 201,82 Ohio St.3d 367, 370 (1998), the minor plaintiff was injured following a scrimmage during soccer practice. Excited about winning, the boy jumped on one of the goals and swung back and forth. The goal was not anchored to the ground and fell over on the plaintiff. Prior to her seven year old's participation with the defendant soccer club, the minor plaintiff's mother had signed an agreement releasing the defendants "against any claim by or on behalf of the registrant as a result of the registrant's participation in the soccer club. . . ." The Court held that the exculpatory agreement was valid as to all claims against the defendants.
The Court in Zivich reasoned that "the proper focus is not whether the release violates public policy but rather that public policy itselfjustifies the enforcement of this agreement". 82 Ohio St.3d at 370. The Court then explained the manner in which public policy favored the enforcement of such agreements:
It cannot be disputed that volunteers in community recreational activities serve an important function. Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. . . . Due in great part to the assistance of volunteers, CT Page 10324 nonprofit organizations are able to offer these activities at minimal cost Clearly, without the work of its volunteers, these nonprofit organizations could not exist, and scores of children would be without the benefit and enjoyment of organized sports. Yet the threat of liability strongly deters many individuals from volunteering for nonprofit organizations. Developments in the Law — Nonprofit Corporations — Special Treatment and Tort Law (1992), 105 Harv.L.Rev. 1667, 1682
 Therefore, faced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort. Hence, invalidation of exculpatory agreements would reduce the number of activities made possible through the uncompensated service of volunteers and their sponsoring organizations.
 Therefore, we conclude that although Bryan, like many children before him, gave up his right to sue for the negligent acts of others, the public as a whole received the benefit of these exculpatory agreements. Because of this agreement, the Club was able to offer affordable recreation and to continue to do so without the risks and overwhelming costs of litigation.
Id. at 371-372.
The Zivich Court also held that parents have the authority to enter into these types of binding agreements on behalf of their minor children. Id. The Court noted that the law empowers a parent to make many important life choices for his or her children. In rendering its decision, the court specifically refused to equate a pre-injury release with a post-injury release, which some courts have found unenforceable.Id. The court explained that "a parent who signs a release before her child participates in a recreational activity . . . has no financial motivation to sign the release;" is unlikely to maliciously sign such a release in deliberate derogation of her child's best interest; and is less vulnerable to coercion and fraud than a parent in the position of disposing of a child's existing claim. Id.
In Cooper v. US Ski Assn., No. 97 CV 107 (Colo.App.Ct. Aug. 17, 2000), the seventeen year old plaintiff was involved in a skiing accident. Prior to his accident, both the plaintiff and his mother signed CT Page 10325 a release of any and all claims against the defendants. The critical issue before the Court was whether a parent could release the claims of her minor child for possible future injuries. Id. The court considered decisions of both the Washington Supreme Court in Scott v. Pacific WestMountain Resort, 119 Wash.2d 484, 834 P.2d 6 (1992) and the Ohio Supreme Court in Zivich on this issue. In Scott the Washington Supreme Court relied on precedent concerning a parent's post-injury release signed on behalf of a child in determining that a parent did not have a legal authority to release a child's claims for personal injuries as a matter of public policy. Conversely, in Zivich, the Ohio Supreme Court held that Ohio public policy justified enforcement of the exculpatory agreement.
The Colorado Court of Appeals agreed with the Zivich decision, and adopted the same conclusion. The Court refused to distinguish Zivich on the basis that the Zivich Court addressed liability in a non-paid, volunteer situation. Rather it upheld the parental release on the basis of the fundamental right of parents under the due process clause to make decisions concerning the care, custody, and control of their children.Id., citing, Troxel v. Granville, ___ U.S. ___, 120 S.Ct. 2054 (2000). The Court also noted that the minor plaintiff and his mother had executed releases in the past and that the minor plaintiff had participated in the ski club's activities for approximately nine years. Cooper, supra.
In Hohe v. San Diego Unified Sch. Dist., 224 Cal.App.3d 1559,274 Cal.Rptr. 647 (1990), the fifteen year old plaintiff and her father signed a release before the minor plaintiff's participation in a hypnotism show at her high school. During the show, the minor plaintiff slid from her chair and fell to the floor approximately 6 times. The plaintiff argued that the signed releases were contrary to public policy. The Court of Appeals of California disagreed.
 [N]o public policy opposes private, voluntary transactions in which one party, for consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party. . . .
 Hohe, supra, quoting, Tunkl v. Regents of University of California,60 Cal.2d 92, 101, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). The court found that there was no essential service or good being withheld by the defendant in this case. Hohe, supra. As in Zivich, the court also noted the benefit which recreational and sports activities provide to children. The court stated:
Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing-victims of decreasing financial CT Page 10326 and tax support for other than the bare essentials of an education. Every leaming experience involves risks. In this instance, Hohe agreed to shoulder the risks. No public policy forbids the shifting of that burden.
Therefore, the Court held that the minor plaintiff could not disaffirm the release because she was a minor.
Similarly, in Brooks v. Timberline Tours, Inc., 941 F. Sup. 959
(D.Colo. 1996), the United States District Court for the District of Colorado addressed the enforceability of a release signed by a parent on behalf of his minor child. In Brooks, Mrs. Brooks was injured and the Brooks minor son was killed in a snow mobile accident. The court held that the exculpatory agreement signed by the Brooks on behalf of their minor son was valid. Id.
In Aaris v. Las Virgenes Unified School District, 64 Cal.App.4th 1112, ___ Cal.Rptr. ___, ___ P.2d ___ (1998), a minor plaintiff cheerleader brought suit against a school district for injuries sustained while participating in cheerleading practice. Citing Hohe, the court affirmed the lower court's grant of summary judgment in favor of the school district based upon the well established California rule that a parent may execute a release on behalf his/her child. Id. at 1122.
In Randas v. YMCA of Metropolitan Los Angeles, 17 Cal.App.4th. 158,21 Cal.Rptr.2d 245 (1993), the plaintiff, who was literate in Greek but not in English, signed a release as a condition of enrolling in a swimming class at the local YMCA. That same day, she slipped and fell on the wet poolside tile. The court specifically declined to invalidate the release on public interest grounds. The court noted that "swimming, like other athletic or recreational activities, however enjoyable or beneficial, is not `essential'. . . ." The court found that there was good reason to validate such releases.
The public as a whole receives the benefit of such waivers so that groups such as boys and girls scouts, little league, and parent-teacher associations are able to continue without the risk and sometimes overwhelming cost of litigation. Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing — victims of decreasing financial and tax support for other than the bare essentials of an education. Every learning experience involves risks. . . . No public policy forbids the shifting of that CT Page 10327 burden.
Randas, quoting, Hohe, 4 Cal.App.3d at 1564.
The interpretation of an exculpatory contract is colored by two diametrically opposed legal principles: the first, that it is against public policy to contract away one's liability for negligent acts in advance and the second, that the court will enforce agreements of the parties made with consideration. A seminal case in the area of waivers of liability is Tunkl v. Regents of University of California, 60 Cal.2d 92,32 Cal.Rptr. 33, 383 P.3d 441 (1963), where the California Supreme Court held that public policy prevented the enforcement of exculpatory contracts for services provided in the public interest, such as the hospital services provided to the plaintiff. The Court invalidated an exculpatory contract which the hospital required the plaintiff to sign before providing medical services, and set forth six factors to consider in determining whether or not an excupatory contract violates public policy. The six factors are (1) does the release concern an activity generally thought suitable for public regulation; (2) is the party seeking exculpation engaged in performing a service of great importance to the public; (3) is the service open to any member of the public; (4) is the nature of the service essential; (5) does the party seeking exculpation have superior bargaining power, raising the issue of whether or not the release constitutes an adhesion contract; and (6) does the release place one party under the control of the other.
In Okura v. United States Cycling Federation, 186 Cal.App.3d 1462,231 Cal.Rptr. 429 (1986) the plaintiff was injured in a bicycle race known as the Hermosa Beach Grand Prix. He fell when his bicycle hit loose debris along the course. The Court applied the six factor test set forth in Tunkl and held that the release signed by the plaintiff prior to participation in the bicycle race did not violate public policy. First, the court concluded that organized racing of bicycles was not subject to public regulation. Second, although the bicycle race was a public service, it did not measure up to the public importance necessary to void a release. Third, the service provided was not essential such as the provision of food, transportation, hospital services, etc. Fourth, there was a voluntary relationship between the parties and no evidence of an adhesion contract. Fifth, the plaintiff did not place himself in exclusive control of the defendants. The plaintiff "retained complete control of himself and his bicycle and at any time could have dropped out of the race." The court did find that the service was open to any member of the public, but concluded that that fact alone was insufficient to preclude the enforceability of the release.
As in Okura, the Tunkl factors favor the enforceability of the Waiver 
CT Page 10328 Release signed by Gabriel and Jerome Fischer. First, organized hockey at this level is not the subject of public regulation. Second, the defendants do not provide a public service like transportation, food, or medical care. Third, although the rink is open to any member of the public, the opportunity to play hockey for the Norwich Ice Breakers was not available to any member of the public. At this level of hockey, players were skilled and either tried out or were invited to play. Fourth, the service provided was not essential. Fifth, the relationship between these parties was voluntary. Gabriel Fischer decided to play hockey and signed a release on more than eight occasions in order to do so. Sixth, the plaintiff did not place himself in exclusive control of the defendants, as the plaintiff in Tunkl, who, as a patient was under the control of the defendant hospital. At anytime during his years of hockey, or more specifically during any of the games, Gabriel Fischer could have stopped playing.
Several Connecticut trial courts have considered the enforceability of exculpatory contracts similar to the one at question in this case. InConnors v. Reel Ice, Inc., No. CV 98 0579993s (Conn.Super.Ct. July 24, 2000), Judge Wagner granted the defendants' motion for summary judgment in a case similar to this case. The court found that the release was sufficient to bar the plaintiff's claims because it explicitly released the defendants from liability for injuries caused by the negligence of the releasees. The court also noted that the plaintiff had played in seven previous hockey leagues, and that "there was no inequity of bargaining power between plaintiff and rink owner because the plaintiff was free to play at another rink or not to play at all." The court held that the athlete's signed wavier and release was enforceable against the athlete.
In Lombardo v. McGuire Group, Inc., No. CV 96 077767 (Conn.Super.Ct. June 6, 1997) (Arena, J.), the plaintiff was injured when he collided with a chain link fence while playing in a softball game. Prior to participating in the game, the plaintiff signed a liability waiver that provided:
 To the fullest extent permitted by law I agree to indemnify and hold harmless the City of Middletown and its [sic] employees from any injuries or damages caused by or resulting from participation in this program.
The plaintiff brought an action against the City alleging negligence and public nuisance. The City moved for summary judgment based on the above release of liability signed by the plaintiff. The court enforced the waiver provision against the plaintiff and concluded that such a waiver CT Page 10329 was not violative of public policy:
 It is general policy that "[p]arties may not stipulate for protection against liability for negligence in the performance of a duty imposed by law or where public interest requires performance." Fedor v. Mauwehu Council, supra, 21 Conn. Sup. 39; see 6 Wihiston, Contracts (Rev. Ed.) § 1751 C. It cannot be said that, under the present set of facts, the City's waiver seeks this type of immunity. Accordingly, the court finds that the present case does not warrant a finding that the enforcement of the waiver would be against public policy.
In Howroyd v. Clifford, 20 Conn.L.Rptr. No. 6, 214 (Conn.Super.Ct. Oct. 27, 1997) (Sullivan, J.), the court examined a liability waiver signed by a minor. In Howroyd, the defendant asserted, by way of special defense, that the minor plaintiff and his parent had signed a general release waiver form as a prerequisite to participation in a police department "Ride-A-Long" program for youths. The plaintiff moved to strike the special defense claiming that the waiver was contrary to public policy. The court denied the plaintiff's motion to strike and distinguished the Superior Court's much earlier decision in Fedor v.Mauwehu Council, 21 Conn. Sup. 38 (1958), on the basis that Fedor
involved "the potential deprivation, on the basis of economic poverty, of children to attend summer camp, a traditional youth activity . . ." On the contrary, the court found that the waiver in the instant case was "required to participate in a special program which [was] not thought to be the type of general educational program which forms a traditional part of the curriculum required by state law or regulation. "
The plaintiffs argue that the Waiver Release violates public policy because it allows the defendants to contract away their liability for negligence. However, in light of the Supreme Court's decision in Jaworskiv. Kiernan, 241 Conn. 399, 696 A.2d 332 (1997), there is a significant doubt as to whether the defendants have any liability for negligent conduct in this case. In Jaworski the Court held that participants in a team athletic contest involving contact as part of the sport owe a duty of care to refrain only from reckless or intentional conduct toward other participants and one who is inured by negligent conduct alone may not recover for their injuries. While Jaworski involved adult participants, its analysis of the public policy considerations is quite applicable to the conduct at issue in this case:
Having concluded that the plaintiff's injury was a foreseeable consequence of the defendant's actions, we CT Page 10330 need to determine as a matter of policy the extent of the legal duty to be imposed upon the defendant. In order to determine the extent of the defendant's responsibility, we consider: (1) the normal expectations of participants in the sport in which the plaintiff and the defendant were engaged; (2) the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions. See, e.g., Maloney v. Conroy, supra, 208 Conn. 400-401 (looking beyond foreseeability to other pragmatic concerns to limit liability).
 In athletic competitions, the object obviously is to win. In games, particularly those played by teams and involving some degree of physical contact, it is reasonable to assume that the competitive spirit of the participants will result in some rules violations and injuries. That is why there are penalty boxes, foul shots, free kicks, and yellow cards. Indeed, the specific rules applicable to this game demonstrate that rules violations were expected in the normal course of the game. See footnote 1. Some injuries may result from such violations, but such violations are nonetheless an accepted part of any competition. Simply put, when competitive sports are played, we expect that a participant's main objective is to be a winner, and we expect that the players will pursue that objective enthusiastically. We also anticipate that players in their enthusiasm will commit inadvertent rules violations from which injuries may result. The normal expectations of participants in contact team sports include the potential for injuries resulting from conduct that violates the rules of the sport. These expectations, in turn, inform the question of the extent of the duty owed by one participant to another. We conclude that the normal expectations of participants in contact team sports counsel the adoption of a reckless or intentional conduct duty of care standard for those participants.
 241 Conn. at 407-408. Emphasis added.
In Hotak v. Seno, No. CV 00 0072461S (Conn.Super.Ct. June 12, 2001, CT Page 10331 Arnold, J.) the plaintiff, a minor, filed an action against another minor who had been a student in the plaintiff's school gym class. The plaintiff alleged that the defendant was negligent and careless when, while playing baseball, he struck the plaintiff in the head with a baseball bat. The defendant moved to strike the plaintiff's claim on the basis that there was no cause of action for mere negligence so as to permit recovery for any injury sustained in a team sport. The defendant cited Jaworski in support of its motion.
The court granted the defendant's motion to strike, relying uponJaworski as well as two New Jersey Supreme Court decisions that have extended the standard of care of recklessness or intentional conduct to the sport of golf. Drawing on the reasoning of Schick v. Ferolito,167 N.J. 7, 767 A.2d 962 (2001) and Crawn v. Campo, 136 N.J. 494,643 A.2d 600 (1994), the court cited the March 12, 2001 ruling of the New Jersey Supreme Court:
 The court perceives no persuasive reason to distinguish between contact and noncontact sports. Risk of injury is a common and inherent aspect of athletic effort generally. It may arise from the physical nature of the athletic endeavor, creating a possibility or likelihood of direct physical contact with another player or with a ball. The risk of injury is just as real when it arises from an instrument used in a game, such as swinging a golf club or the small hard ball the club propels at a very high rate of speed. Even for an experienced golfer, the course a golf ball takes is often unpredictable through no conscious fault of the golfer.
167 N.J. at 18. Emphasis added.
The public policy considerations discussed in Jaworski and Schick are also present in this case. Skating, sliding, speed, contact and injury are all part of the sport of competitive ice hockey. The normal expectation of the participants in a contact sport such as hockey is that there will be injuries which result from playing the game. Jaworski has dictated that adult participants cannot sue for conduct that is merely negligent. Other courts, particularly Zivich, have persuasively supported the public policy reasons for upholding an exculpatory contract involving minors such as the Waiver Release signed by the plaintiffs in this case. Therefore, the Waiver Release does not violate the public policy of this state and is enforceable.
The plaintiffs seek to escape the Waiver Release into which they CT Page 10332 voluntarily entered by averring that they did not read it. The minor plaintiff played hockey for many years prior to the unfortunate accident at issue in this case. The plaintiffs do not dispute the defendants' evidence that they were required to sign a Waiver and Release for the following years: 1990-1991; 1991-1992; 1992-1993; 1993-1994; 1994-1995; 1995-1996; and 1996-1997. The general rule in our state is that where a person who is of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is that person's duty to read it and notice of its contents will be imputed to that person if that person negligently fails to do so. Phoenix Leasing,Inc. v. Kosinski, 47 Conn. App. 650, 654, 707 A.2d 314 (1998), quoting,First Charter National Bank v. Ross, 29 Conn. App. 667, 671, 617 A.2d 909
(1992). Therefore, the plaintiffs' claim that they did not read the release does not save them from it effects.
Since the Waiver Release is valid and enforceable, and applies to "USA Hockey, Inc., its Affiliate Associations, Local Associations, Member teams, event hosts, other participants, coaches, officials, sponsors, advertisers, owners and operators of the premises used to conduct any event and each of them, their officers, directors, agents and employees," it is a bar to the plaintiffs' negligence claims against all defendants. However, the Waiver Release does not bar the plaintiffs' claims for reckless conduct. Although the plaintiffs have alleged reckless conduct on the part of Gregory Haney, the opposing hockey player, they have presented no evidence to establish that Haney's conduct was reckless. The affidavit of Gabriel Rivest indicates that he was hit hard from behind and that such conduct was "a violation of the rules." There is no other competent evidence that any rules were violated or even indicates which rules were violated, and neither official present at the time found any rule violation.
Under Jaworski, a violation of the rules of the sport in question is not sufficient to constitute reckless conduct. The Court expected that:
 In games, particularly those played by teams and involving some degree of physical contact, it is reasonable to assume that the competitive spirit of the participants will result in some rules violations and injuries. That is why there are penalty boxes, foul shots, free kicks, and yellow cards. Indeed, the specific rules applicable to this game demonstrate that rules violations were expected in the normal course of the game.
241 Conn. at 407-408. CT Page 10333
Under Jaworski a mere rules violation does not constitute actionable conduct. In this case there is undisputed evidence that the officials present at the time found no rules violation by Haney. The plaintiffs have presented Gabriel Rivest's opinion that Haney's conduct constituted a rules violation. While there is, therefore, an issue of fact as to whether or not there was a rules violation by Haney, it appears clear that there is no evidence of an egregious violation which would rise to the level of reckless conduct. Since the plaintiffs presented no other evidence of reckless conduct by Haney they have not presented sufficient evidence of reckless conduct to defeat the present summary judgment motion. See Buell Industries v. Greater New York Mutual Ins.,259 Conn. 527, 556, 557, 791 A.2d 489 (2002) (mere conclusory statement in affidavit not sufficient to create issue of material fact and defeat summary judgment).
The Waiver Release signed by the plaintiffs is clear and unambiguous. It is axiomatic that "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." Levine v. Massey,232 Conn. 272, 279, 654 A.2d 737 (1995). "The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." 232 Conn. at 279. In the instant case, the ordinary meaning of the words leaves no room for ambiguity.
The Waiver Release states, in pertinent part, that:
 Participant and/or participant's parent(s)/guardian(s) acknowledge, understand and assume all risks inherent in ice hockey and any member team activities, and understand that said sport and activities involve risks to participant's person including bodily injury, partial or total disability, paralysis, and death, and damages which may arise therefrom and that I/we have full knowledge of said risks. These risks and dangers may be caused by the negligence of the participant or the negligence of others including the "releasees" identified below. It is further acknowledged that there may be risks and dangers not known to us or are not reasonably foreseeable at this time
Participant and/or participant's parent(s)/guardian(s) acknowledge, understand and assume the risks, if any, arising from the conditions and use of ice hockey rinks and related premises and acknowledges and understands that included within the scope of this CT Page 10334 waiver and release is any cause of action arising from the performance, or failure to perform maintenance, inspection, supervision or control of said areas and for the failure to warn of dangerous conditions existing at said rinks, for negligent selection of certain releasees, or negligent supervision or instruction by releasees.
 It is the purpose of this agreement to exempt, waive and relieve releasees from liability for personal injury, property damage, and wrongful death caused by negligence, including the negligence, if any, of releasees. "Releasees" include USA Hockey, Ic., its Affiliate Associations, Local Associations, Member teams, event hosts, other participants, coaches, officials, sponsors, advertisers, owners and operators of the premises used to conduct any event and each of them, their officers, directors, agents and employees
 Participant and/or participant's parent(s)/guardian(s) acknowledge that they have been provided and have read the above paragraphs and have not relied upon any representations of releasees, that they are fully advised of the potential dangers of ice hockey and understand these waivers and releases are necessary to allow amateur ice hockey to exist in its present form
Emphasis added.
It is difficult to imagine how the dangers or causes of potential injury could be more clearly set forth than they are in the Waiver 
Release. It is also difficult to imagine what more USA Hockey could have done to advise the Fischers of the dangers or to obtain the Fischers' acknowledgment that they understood the dangers of hockey.
The plaintiffs also argue that the Waiver Release is ambiguous because it does not state that risks may be caused by flagrant rules violations. This argument is without merit because, as stated above, the plaintiffs have presented no evidence of any flagrant rule violation, and scant evidence of any rule violation at all.
The law does not require that a release be perfect. "Apparently [however] no release is immune from attack." National and Int'lBrotherhood of Street Racers, Inc. v. Superior Court, 215 Cal.App.3d 934,937, 265 Cal.Rptr. 44 (1989) In National and Int'l Brotherhood, the Court noted: CT Page 10335
 If short and to the point, a release would be challenged as failing to mention the particular risks which caused a plaintiff's injury or as insufficiently comprehensive. . . . If the drafter avoids the shortcomings by adding details and illustrations, the plaintiff invokes the doctrine expressio unius exclusio alterius est and characterizes the causative hazard as one not found among those listed in the release, but if the list ends with an inclusive term "and all other risks not specifically enumerated" it will be argued, under the principal ejusdem generis,
that the risk encountered is nonetheless not assumed, because its nature is different from those listed. If the drafter strives to be comprehensive, the release is attacked as unduly lengthy, but if he fits it onto a single page, the type size will be criticized as inadequate. (Internal citations omitted).
 In cases arising from hazardous recreational pursuits, to permit released claims to be brought to trial defeats the purpose for which releases are requested and given, regardless of which party ultimately wins the verdict. Defense costs are devastating. Unless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction.
215 Cal.App.3d at 937-38. "To be effective, a release need not achieve perfection. . . . It suffices that a release be clear, unambiguous and explicit, and that it express an agreement not to hold the released party liable for negligence." 215 Cal.App. at 938. The release signed by Gabriel and Jerome Fischer meets this standard.
This court agrees with the Courts in Zivich, Cooper, and Hohe, supra,
that the public policy of this state supports the enforcement of the Waiver Release. The injuries sustained by Gabriel Fischer were tragic. However, if courts did not enforce this type of exculpatory contract, organizations such as USA Hockey, Inc., little league and youth soccer, and the individuals who volunteer their time as coaches could well decide that the risks of large legal fees and potential judgments are too significant to justify their existence or participation. Thousands of children would then be deprived of the valuable opportunity to play organized sports.
For the reasons set forth above, summary judgment may enter in favor of CT Page 10336 the defendants Paul Rivest, USA Hockey, Inc., Connecticut Hockey Conference, Inc. and City of Norwich on Counts One, Three, Four, Five and Six of the Complaint. Count Two of the Complaint is against Gregory Haney who was not a party to the Motion for Summary Judgment under consideration here, and therefore, the court makes no ruling with respect to Count Two.
 By the court, _______________ Aurigemma, J.