MORNER et al., Appellants,

v.

GIULIANO, Appellant; Alfers et al., Appellees.

[Cite as *Morner v. Giuliano*, 167 Ohio App.3d 785, 2006-Ohio-2943.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

Nos. CA2005–09–371 and CA2005–09–372.

Decided June 12, 2006.

Donald C. LeRoy, for appellants Sara A. Morner, David Morner, and Ann Morner.

Schroeder, Maunderell, Barbiere & Powers and John W. Hust, for appellant Matt Giuliano.

C. Joseph McCullough, for appellees, Mark A. Alfers, Mark E. Alfers, and Nancy Alfers.

Rendigs, Fry, Kiely & Dennis, L.L.P., John F. McLaughlin, Lynne M. Longtin, for intervening-appellee, State Farm Fire and Casualty Company.

YOUNG, Judge.

{¶ 1} Plaintiffs-appellants, Sara Morner and her parents, David and Ann Morner, and defendant-appellant, Matt Giuliano, appeal a decision of the Butler County Common Pleas Court granting summary judgment in favor of defendants-appellees, Mark A. Alfers and his parents, Mark E. and Nancy Alfers, and intervening defendant-appellee, State Farm Fire and Casualty Company.

{¶ 2} On the evening of October 13, 2001, Mark A. Alfers invited a number of his classmates to his parents' house following a high school soccer match. The students attending the gathering included Sara Morner and Matt Giuliano. At the time, Mark and Giuliano were 17 years old, and Sara was 16 years old. Mark's parents were not home at the time the party was held, nor had they given Mark permission to host a party.

{¶ 3} At some point during the evening, Giuliano obtained Mark's pump-action air rifle from one of the other students at the party, Graham Crane. The air rifle

was loaded with BBs. Giuliano went outside onto a balcony with the air rifle or BB gun and shot several times at an outside flood light in the Alfers's back yard. Each shot missed.

{¶ 4} Giuliano then went downstairs and began shooting at people. His purpose in shooting at others was not to cause them serious injury, but only to "aggravate" them or "to get a rise" out of them. He expected that the BB would cause any person he shot a "stinging sensation" and a "welt." First, he went into the living room and shot Betsy Browe in the leg while she was sitting on the couch. According to Giuliano, the BB "didn't break her jeans or didn't hurt her at all." Soon thereafter, Giuliano shot Sean Lehmann. According to Giuliano, Lehmann expressed no painful reaction to being shot, but instead, wanted to shoot the BB gun himself. Giuliano would not let him take the gun.

{¶ 5} After shooting Browe and Lehmann, Giuliano went outside to the back yard and shot at the flood light several more times. Again, all the shots missed. Giuliano then went to a neighboring yard. From there, he saw several people, including Graham Crane and Sara Morner, walk out onto the upstairs balcony of the Alferses' home. Giuliano decided to shoot at them to aggravate them. Again he expected to cause them a stinging sensation or a welt. He was standing approximately 20 to 25 feet from the balcony, and the balcony was approximately 10 to 15 feet above him, when he fired a BB at Crane, Morner, and the others. When Giuliano fired the shot, Crane yelled out, "Heads up!" or "Duck!" to the others present. When Sara heard this, she turned around to see what Crane was yelling about and was struck in the eye with the BB.

{¶ 6} Sara immediately went back inside the Alferses' residence. Giuliano walked around to the Alferses' front yard. Just at that time, Mark A. Alfers was returning to his residence from a quick trip he had made to a fast-food restaurant along with several of his friends, including Alicia Brewer and Brett Noonan. Giuliano decided to shoot at Noonan with the BB gun. However, when Giuliano fired, his shot missed Noonan and hit Brewer in the side. Mark took Brewer inside. After he came back outside, Mark took the BB gun away from Giuliano and asked him, "What the heck was that? What are you doing?" Giuliano replied that he was not sorry.[1]

{¶ 7} In the meantime, several people attended to Sara Morner. They got her a washcloth for her eye, which was bleeding. At first, Sara did not wish to seek medical attention because of an incident that had occurred at Mark's residence about two weeks earlier. On that occasion, Mark, Sara, Brett Noonan, and Brett

---

1. Both Mark A. Alfers and Giuliano acknowledged that there had been alcohol present at the party, and Mark even acknowledged that he kept beer in his bedroom. However, both Mark and Giuliano denied that they had had anything to drink on the night Sara was injured.

Fiehrer were upstairs in Mark's bedroom. Noonan took Mark's BB gun and fired a BB at the floor. The BB ricocheted off the floor and struck Fiehrer in the ankle, becoming partially imbedded there. The teenagers had dug the BB out of Fiehrer's ankle. Sara told her father what had happened. Sara's father warned her not to go around BB guns anymore and that if she saw one, she should leave.

{¶ 8} When Giuliano saw that he had caused Sara a more serious injury than he had intended, he apologized to her. Sara forgave him. She then decided she needed to seek medical treatment. Sara was taken to a hospital where it was discovered that the BB had done serious damage to her left eye. As a result of her injury, Sara can no longer see out of her left eye.

{¶ 9} On October 10, 2003, Sara and her parents, David and Ann Morner, filed a complaint against Giuliano, Mark A. Alfers, and Mark's parents, Mark E. and Nancy Alfers. The Morners alleged that Giuliano was negligent in shooting at Sara with a BB gun and that the Alfers were negligent in controlling or maintaining the BB gun that Giuliano used to shoot Sara. The Morners also alleged that Mr. and Mrs. Alfers were negligent in permitting a large number of teenagers to congregate at their residence without appropriate adult supervision, knowing that the BB gun was at their residence and was accessible to those teenagers. The Morners further alleged that Mark was negligent in failing to warn his guests about a known hazard and in failing to protect them from it.

{¶ 10} In their answer to the Morners' complaint, the Alfers denied all of the material allegations in the complaint that were directed against them, and alleged that the Morners' injuries and damages "were caused by independent, intervening and/or superseding acts, events, negligence and/or omissions of persons other than [the Alferses]." The Alferses also brought a cross-claim against Giuliano, arguing that any damages sustained by the Morners "were the direct and proximate result of [Giuliano's] negligence," and that if judgment was rendered against the Alferses, the Alferses were entitled to contribution or indemnity from Giuliano for those damages.

{¶ 11} At the time of the incident, Giuliano's father had a homeowners policy with State Farm Fire and Casualty Company. Giuliano was one of the named insureds under the policy. On March 15, 2004, State Farm filed an intervening complaint for declaratory judgment, seeking a declaration that State Farm was not obligated under the terms of the policy to defend or indemnify Giuliano against the Morners' claims.

{¶ 12} On August 16, 2004, State Farm moved for summary judgment with respect to its declaratory-judgment action, arguing that it was entitled to a declaration that it was not obligated to defend or provide coverage to Giuliano by virtue of several of the policy's exclusions, among them, those excluding "expected or intended" injury and "willful and malicious" conduct. On that same day,

the Alferses moved for summary judgment with respect to the Morners' claims, arguing that none of them was negligent with respect to the events that led to the Morners' injuries.

{¶ 13} On August 5, 2005, the trial court awarded the Alferses and State Farm summary judgment. Specifically, the trial court found that there was no negligence on the part of Mark A. Alfers or his parents, Mark E. and Nancy Alfers, either in failing to warn Sara Morner about the BB gun or Giuliano, or in storing a loaded BB gun at their residence. The trial court also found that State Farm was not obligated to defend or provide coverage to Giuliano as a result of the Morners' claims against him because the incident did not qualify as an accidental occurrence and thus did not trigger coverage under the policy. Alternatively, the court found that coverage was precluded under the policy's exclusions for "expected or intended" injury or "willful and malicious" conduct.

{¶ 14} The Morners and Giuliano now appeal, raising the following assignments of error:

{¶ 15} Assignment of error No. 1:

{¶ 16} "The trial court erred in granting State Farm's motion for summary judgment by finding as a matter of law that State Farm had no duty to defend or to provide coverage under its policy of insurance to Matt Giuliano."

{¶ 17} Giuliano and the Morners contend that genuine issues of material fact exist as to whether Giuliano's discharge of the BB gun and the injury it caused Sara constituted an "accident that results in bodily injury," which would render the act and injury a covered "occurrence" for purposes of the policy. They further contend that there are genuine issues of material fact as to whether any of the exclusions in the policy apply to bar coverage, including the exclusions for "expected or intended" injury or "willful and malicious" conduct. Consequently, they argue that the trial court erred in granting summary judgment to State Farm and in declaring that State Farm had no duty to defend or to provide coverage to Giuliano as a result of the incident. We disagree with this argument.

{¶ 18} "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201. "The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." Id.

■ {¶ 19} "It is axiomatic that an insurance company is under no obligation to its insured, or to others harmed by the actions of an insured, unless the conduct alleged of the insured falls within the coverage of the policy. Coverage is provided if the conduct falls within the scope of coverage defined in the policy, and not within an exception thereto." *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 36, 665 N.E.2d 1115.

{¶ 20} At the time of the shooting, Giuliano was covered as an insured under his father's homeowners policy with State Farm. The policy's liability coverages are set forth in Section II of the policy. "Coverage L" of the policy provides an insured coverage for certain types of personal liability that the insured may incur. That provision states:

{¶ 21} "COVERAGE L—PERSONAL LIABILITY

{¶ 22} "If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

{¶ 23} "1. pay up to our limit of liability for the damages for which the insured is legally liable; and

{¶ 24} "2. provide a defense at our expense by counsel of our choice."

■ {¶ 25} The policy defines the term "occurrence" as "an accident" which results in "bodily injury." The policy defines "bodily injury" as "physical injury, sickness or disease to a person" and "includes required care, loss of services and death resulting therefrom." The policy does not define the term "accident." However, the Ohio Supreme Court has stated that "inherent in a policy's definition of 'occurrence' is the concept of an incident of an *accidental,* as opposed to an *intentional,* nature." (Emphasis sic.) *Gearing,* 76 Ohio St.3d at 38, 665 N.E.2d 1115. The court has also stated that the word "occurrence" when defined as "an accident" is "intended to mean just that—an unexpected, unforeseeable event." *Randolf v. Grange Mut. Cas. Co.* (1979), 57 Ohio St.2d 25, 29, 11 O.O.3d 110, 385 N.E.2d 1305. Under Ohio law, when a term in an insurance contract is not defined by the policy, the term is to be given its ordinary meaning. *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.* (C.A.6 1993), 990 F.2d 865, 872. The ordinary meaning of the term "accident" in an insurance policy refers to "unintended" or "unexpected" happenings.

{¶ 26} The policy also contains several exclusions from coverage. Specifically, the policy states that Coverage L does not apply to bodily injury "(1) which is either expected or intended by the insured; or (2) which is the result of willful and malicious acts of the insured." The Ohio Supreme Court has held that "in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or

intended. It is not sufficient to show merely that the act was intentional." *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 193, 569 N.E.2d 906.

{¶ 27} Thus, under the terms of the policy, coverage is provided to an insured for injuries arising from an act or event that constitutes an "accident," i.e., an act or event that is unintended or unexpected. At the same time, coverage is excluded under the express terms of the policy if the injury arises from an act or event that is either "expected or intended by the insured."

{¶ 28} There are three general views that have developed in this country with respect to an insurance policy's exclusion for expected or intended injuries. *Altena v. United Fire and Cas. Co.* (Iowa, 1988), 422 N.W.2d 485, 488, citing *Pachucki v. Republic Ins. Co.* (1979), 89 Wis.2d 703, 278 N.W.2d 898. The majority rule with respect to such intentional-injury exclusions is that "the exclusion applies if the insured intended to do a particular act, and intended to do some harm, even if the harm actually done was radically different from that intended. * * * On the other hand, an 'intentional injury' exclusion will not apply if the insured intentionally does an act, but has no intent to commit harm, even if the act involves the foreseeable consequences of great harm or even amounts to gross or culpable negligence." *Allstate Ins. Co. v. Steinemer* (C.A.11, 1984), 723 F.2d 873, 875.

{¶ 29} The minority rule with respect to intentional injury exclusions " 'follows the classic tort doctrine of looking to the natural and probable consequences of the insured's act.' " *Altena*, 422 N.W.2d at 488, quoting *Pachucki*, 89 Wis.2d at 708, 278 N.W.2d 898. " 'A third view is that the insured must have had the specific intent to cause the type of injury suffered.' " Id. Massachusetts is a state that has adopted this third view. The Supreme Judicial Court of Massachusetts has consistently stated that "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co. v. Abernathy* (1984), 393 Mass. 81, 84, 469 N.E.2d 797.

{¶ 30} Giuliano and the Morners argue that the determination as to whether an insured expected or intended to cause injury is a question of fact unless a trial court can find as a matter of law that there was a substantial certainty that an injury would occur. In support of this argument, both parties rely on *Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906. However, their reliance on that case is misplaced.

{¶ 31} In *Swanson*, the defendant, Bill Swanson, fired a shot from a BB gun in the direction of a group of teenagers sitting at a picnic table 70 to 100 feet away.

The shot struck one of the teenagers, Todd Baker, in the eye. Baker lost his right eye as a result. Earlier that day, Swanson, himself a teenager, had gotten into an argument with the other teenagers. Swanson said his purpose in shooting in the teenagers' direction was only to scare them by hitting a sign on a tree some ten to 15 feet away from them. He insisted that he did not intend to shoot anyone with the BB gun.

{¶ 32} Baker's parents filed suit against Swanson and his parents. The Swansons' insurers brought a declaratory-judgment action seeking a declaration of their obligations under their policies with the Swansons. The trial court found that Swanson did not fire the shot from the BB gun with the intent to injure anybody or with the belief that injury was substantially certain to occur. Therefore, the trial court determined that the insurers had a duty to defend the Swansons and provide them with coverage.

{¶ 33} The insurers appealed the trial court's decision to the Summit County Court of Appeals. The court of appeals held that pursuant to *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, "it is the intentional nature of the act of the insured, rather than the result of such an act, such as the specific injury to Todd's right eye, which determines whether coverage will apply." The court of appeals concluded that since Swanson fired the shot intentionally, the exclusion in the policies for expected or intentional injuries applied to bar coverage. The court of appeals reversed the trial court.

{¶ 34} The Ohio Supreme Court reversed the court of appeals and reinstated the trial court's judgment. In doing so, the court engaged in a detailed review of a number of cases from other jurisdictions concerning intentional-injury exclusions. The cases reviewed included *Steinemer*, 723 F.2d 873, and *Abernathy*, 393 Mass. 81, 469 N.E.2d 797. After discussing these cases, the court stated: "From the above case law, it can be seen that other jurisdictions require that in order for an exclusion of this nature to apply, an insurer must demonstrate not only that the insured intended the act, but also that he intended to cause harm or injury." *Swanson*, 58 Ohio St.3d at 193, 569 N.E.2d 906.

{¶ 35} Consequently, the *Swanson* court found that "the court of appeals erred by requiring that only the act of the insured need be shown to have been intentional." The court held that "in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional." *Swanson*, 58 Ohio St.3d at 193, 569 N.E.2d 906.

{¶ 36} The court concluded that because the trial court's finding that "Todd Baker's injury was not intentionally inflicted or substantially certain to occur is supported by competent, credible evidence," the court of appeals erred by reversing the trial court. Id. It appears that the "competent, credible evidence"

to which the *Swanson* court was referring, was Swanson's testimony that he was only trying to scare Baker and his friends and did not intend to shoot any of them.

{¶ 37} In this case, by contrast, it is undisputed that Giuliano intentionally shot at Sara Morner and others on the night in question. It is also undisputed that Giuliano was attempting to cause those persons some harm or injury when he did so. Specifically, by shooting at Sara and the others with the BB gun, Giuliano was attempting to "aggravate" them and to "get a rise" out of them. He intended that the BB would give the persons he shot a "stinging sensation" and expected that the BB would leave "a welt." It does not appear that he intended or expected to cause the far more serious injury that he in fact did cause to Sara.

{¶ 38} Nevertheless, under the majority rule in this country, it is apparent that with respect to exclusion for expected or intended injury, or intentional-injury exclusion, the exclusion applies "if the insured intended to do a particular act, and intended to do some harm, even if the harm actually done was radically different from that intended." See, e.g., *Steinemer*, 723 F.2d. at 875.

{¶ 39} This court has previously held that an insurance policy's exclusion for expected or intended injuries operates to bar coverage when the insured expected or intended to cause some harm, though not necessarily to the severity or extent to which the insured actually caused harm. For example, in *Horace Mann Cos. v. Harris* (Aug. 11, 1997), Madison App. No. CA96–11–051, 1997 WL 451371, this court held that a policy's exclusion for intended or expected injuries applied when the insured intended to cause some bodily injury to another person when the insured threw a broken pool cue at the person, even though the insured may not have intended to cause the specific injury the other person suffered. See, also, *United Ohio Ins. Co. v. Vanosdol* (June 1, 1993), Warren App. Nos. CA92–08–073 and CA92–08–075, 1993 WL 185612 (holding that *Swanson* "does not stand for the proposition that exclusionary language relating to intended and expected injuries is applicable only when the insured intends to inflict a precise, specific bodily injury on a victim and thereafter inflicts that particular injury. It would be the rare occasion, if ever, where an insured would admit that he or she intended all the injuries that his or her actions caused a victim").

{¶ 40} In light of the foregoing, we conclude that an insurance policy's exclusion for expected or intended injuries applies if the insured intended to do a particular act, and intended to do some harm, even if the harm actually done was radically different from that intended. *Steinemer*, 723 F.2d at 875.

{¶ 41} In this case, the insurance policy's exclusion for expected or intended injuries applied to preclude coverage for Giuliano as a result of his actions in shooting Sara Morner in the eye with a BB gun. Giuliano intended to fire the

BB gun at other persons, including Sara, and intended to do those other persons "some harm." Therefore, coverage for Giuliano is barred under the expected or intended exclusion of the homeowners policy. Id. Furthermore, the exclusion applies even though the harm Giuliano inflicted was radically different from what he had intended. Id. The trial court did not err in granting State Farm summary judgment as to its declaratory judgment action.

{¶ 42} The Morners' and Giuliano's first assignment of error is overruled.

{¶ 43} Assignment of Error No. 2:

{¶ 44} "The trial court erred in granting Mark A. Alfers' motion for summary judgment by finding as a matter of law that Mark A. Alfers did not breach the duty he owed to Sara A. Morner."

{¶ 45} The Morners argue that the trial court erred in granting Mark A. Alfers's motion for summary judgment because genuine issues of material fact remain as to whether Mark took reasonable safety precautions regarding his loaded BB gun, and whether Mark was aware that Giuliano was using the BB gun on the night in question. We disagree with this argument.

{¶ 46} Initially, we note that the Morners have not appealed the trial court's decision to grant summary judgment against them and in favor of Mark's parents, Mark E. and Nancy Alfers. Consequently, the trial court's grant of summary judgment to Mark E. and Nancy Alfers stands and is not at issue in this opinion.

{¶ 47} Sara Morner was Mark's social guest on the night Giuliano shot her in the eye with a BB. Mark owed her "the duty (1) to exercise ordinary care not to cause injury to his guest by any act of the host or by any activities carried on by the host while the guest is on the premises, and (2) to warn the guest of any condition of the premises which is known to the host and which one of ordinary prudence and foresight in the position of the host should reasonably consider dangerous, if the host has reason to believe that the guest does not know and will not discover such dangerous condition." *Scheibel v. Lipton* (1951), 156 Ohio St. 308, 46 O.O. 177, 102 N.E.2d 453, paragraph three of the syllabus.

{¶ 48} In this case, Mark recognized the potential danger of owning a BB gun and took the precaution of keeping the gun hidden away. Mark acknowledged that he kept the gun loaded. However, at no time did he permit any of his guests to enter his bedroom and take the air rifle.

{¶ 49} Furthermore, Mark was unaware that anyone had taken his air rifle. While Giuliano testified in his deposition that Mark may have seen him with the BB gun, Giuliano admitted that he did not interact with Mark while he was in possession of the gun. Additionally, Giuliano testified that he had no reason to

doubt Mark's claim that Mark was unaware that anyone was using the BB gun on the night in question. Under these circumstances, we agree with the trial court's conclusion that a reasonable jury could only have found that Mark took reasonable precautions and was unaware of the use of his BB gun.

{¶ 50} Assuming that Mark was negligent on the evening in question, his negligence was superseded by Giuliano's actions. The existence of intervening and superseding causes of injury can be a defense to a negligence action. *Leibreich v. A.J. Refrigeration* (1993), 67 Ohio St.3d 266, 269, 617 N.E.2d 1068. The issue of intervening and superseding causation *generally* presents factual issues to be decided by the trier of fact, because determination of the issue " 'involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of facts.' " Id., quoting *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 160, 6 OBR 209, 451 N.E.2d 815. "[T]he test to be used to determine whether the intervening act was foreseeable and therefore a consequence of the original negligent act or whether the intervening act operates to absolve the original actor * * * 'is whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor.' " *Leibreich,* 67 Ohio St.3d at 269, 617 N.E.2d 1068, quoting *Cascone,* 6 Ohio St.3d at 160, 6 OBR 209, 451 N.E.2d 815.

{¶ 51} " 'The causal connection of the first act of negligence is broken and superseded by the second, only if the intervening negligent act is both new and independent. The term "independent" means the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence. The term "new" means that the second act of negligence could not reasonably have been foreseen.' " (Emphasis deleted.) *R.H. Macy & Co., Inc. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 111, 554 N.E.2d 1313, quoting 1 Ohio Jury Instructions (1983), Section 11.30. " 'Whether an intervening act breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence.' " (Emphasis deleted.) *R.H. Macy & Co.* at 110, 554 N.E.2d 1313, quoting *Mudrich v. Standard Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 90 N.E.2d 859.

{¶ 52} In this case, Giuliano's act of shooting the BB gun at Sara Morner and others constituted an intervening negligent act that was both "new" and "independent," and that act broke the causal connection between any negligence on Mark's part and Sara's injury. Giuliano's act of shooting Sara and others with the BB gun was independent of Mark's decision to store the loaded BB gun

behind a dresser in his bedroom. Furthermore, Mark testified that he was unaware that anyone was using the BB gun, and Giuliano did not dispute this.

{¶ 53} In *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 231 N.E.2d 870, the Ohio Supreme Court stated:

{¶ 54} "A rule of general acceptance is that, where the original negligence of the defendant is followed by the independent act of a third person which directly results in injurious consequences to plaintiff, defendant's earlier negligence may be found to be a proximate cause of those injurious consequences, if, according to human experience and in the natural and ordinary course of events, defendant could reasonably have foreseen that the intervening act was likely to happen.

{¶ 55} "Or, stating the proposition a little differently, the connection between the defendant's negligence as a proximate cause of an injury is not broken, if an intervening event is one which might in the natural and ordinary course of things be anticipated as reasonably probable, and the defendant's negligence remains an important link in the chain of causation." (Citation omitted.) Id. at 56–57, 41 O.O.2d 274, 231 N.E.2d 870.

{¶ 56} The Morners argue that Giuliano's actions were reasonably foreseeable to Mark and that Mark's negligence "remains an important link in the chain of causation" that led to Sara's injury. We disagree with this argument.

{¶ 57} Initially, Mark could not have reasonably foreseen Giuliano's actions on the night he shot Sara and others with the BB gun. While there was evidence showing that two weeks before Sara was shot in the eye, one of Mark's friends, Brett Fiehrer, was shot in the ankle by another of Mark's friends, Brett Noonan, it appears that this shooting was accidental. Even if this shooting was intentional, the shooting took place at close range, and Noonan clearly fired away from Fiehrer's head. It is also true that Noonan and Fiehrer were both present on the night Sara was shot in the eye. But given the clear dissimilarities between the two episodes, it cannot be said that the incident involving Noonan and Fiehrer made Giuliano's actions reasonably foreseeable to Mark.

{¶ 58} Furthermore, no reasonable juror could have found that Giuliano's actions on the night Sara was shot were reasonably foreseeable to Mark. Giuliano's conduct was thoroughly irresponsible and deplorable. No one could have foreseen it. Accordingly, we conclude that the trial court did not err in granting Mark summary judgment as to the Morners' claims against him.

{¶ 59} The Morners' second assignment of error is overruled.

{¶ 60} The trial court's judgment is affirmed.

Judgment affirmed.

POWELL, P.J., and WALSH, J., concur.