[Cite as *Sheely v. Sheely*, 2012-Ohio-43.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
AUGLAIZE COUNTY


TABITHA SHEELY, ADM. ESTATE
OF IVY SHEELY, DECEASED,

      PLAINTIFF-APPELLANT,           CASE NO. 2-10-38

      v.

DANIEL SHEELY, ET AL.,           O P I N I O N

      DEFENDANTS-APPELLEES.


Appeal from Auglaize County Common Pleas Court
Trial Court No. 2009 CV 0145

Judgment Affirmed

Date of Decision: January 9, 2012


APPEARANCES:

    *Clay W. Balyeat and Andrew R. Bucher* for Appellant

    *Ronald A. Rispo and David L. Jarrett* for Appellee

**SHAW, J.**

{¶1} Plaintiff-appellant, Tabatha Sheely ("Tabatha"), appeals the October 19, 2010 judgment of the Auglaize County Court of Common Pleas denying her motion for partial summary judgment, granting defendant-appellee's, Lightning Rod Mutual Insurance Company ("Lightning Rod"), motion for summary judgment and declaring that there is no coverage under Lightning Rod's home and personal liability policy insuring Daniel Sheely ("Dan") for the wrongful death of Ivy Sheely.

{¶2} On May 13, 2007, Ivy Sheely, the sixteen-year-old daughter of Tabatha and Dan, died when she consumed a large bottle of Vodka, which Dan purchased for her earlier that evening.

{¶3} Tabatha and Dan divorced in the mid-nineties. After the divorce, Ivy lived with Tabatha in Findlay. Up until several months before her death, Ivy visited her father at his St. Johns residence in Auglaize County on the weekends and during some school vacations. However, after Ivy reached the age of sixteen and obtained her driver's license, she made more frequent trips to St. Johns to visit Dan. Some of the trips would last several days. It is during this time that Dan permitted Ivy and her teenage friends to consume alcohol in his home.

{¶4} On the night of her death, Ivy and her best friend, Heather Davies, were spending the weekend at Dan's home in St. Johns. Dan purchased a large

bottle of Vodka, at Ivy's request. Ivy and Heather later took the bottle to John Grieshop, Sr.'s residence, a neighbor of Dan's, where a party was taking place. According to the accounts of those who were present, Ivy consumed almost the entire bottle of Vodka in a short amount of time and was later found in the Grieshop residence unconscious, not breathing, with her mouth full of vomit. Emergency medical personnel were called to the scene. However, Ivy was pronounced dead shortly thereafter.

{¶5} Dan was subsequently charged with child endangering, among other charges, and entered a plea of not guilty. After a jury trial, Dan was convicted of child endangering, in violation of R.C. 2919.22(A)(E)(2)(c), a felony of the third degree, and of furnishing intoxicating liquor to an underage person, in violation of R.C. 4301.69(A) and R.C. 4301.99(I), a misdemeanor of the first degree. On May 27, 2008, Dan was sentenced to serve three years in prison, but was judicially released prior to the expiration of his sentence.

{¶6} On May 4, 2009, Tabatha, in her capacity as the administrator and personal representative of Ivy's estate, filed wrongful death and survivorship actions against Dan and John Grieshop, Sr., alleging them to be jointly and severally liable for Ivy's death.

{¶7} In November of 2009, the parties presented a consent judgment entry to the trial court in which Dan admitted he was negligent as alleged in the

complaint, and accepted liability for Ivy's death. Dan also consented to award Ivy's estate $300,000.00 for the wrongful death and survivorship claims. Tabatha agreed to dismiss the claims against John Grieshop, Sr., without prejudice. The trial court memorialized the consent judgment entry in its November 20, 2009 entry.

{¶8} On November 25, 2009, Tabatha's attorney sent a letter to defendant, Lightning Rod Mutual Insurance Company, the insurer on Dan's homeowner's policy at the time of Ivy's death, demanding it pay the $300,000.00 judgment entered against Dan on November 20, 2009.

{¶9} On April 22, 2010, Tabatha filed a "Supplemental Complaint by Judgment Creditor" pursuant to R.C. 3929.06, alleging that Lightning Rod's policy covered Dan's "conduct which caused bodily injury, including death, to another person."[1] (Supp. Complaint Apr. 10, 2010 at 2). Tabatha asserted that none of the coverage exclusions in the policy applied to this case, and that Ivy's death is an insurable event under the policy.

{¶10} Lightning Rod filed an answer admitting that, at the time of Ivy's death, Dan was insured under a home and personal liability insurance policy issued by Lightning Rod. However, Lightning Rod asserted that Ivy's death was

---

[1] We note that, according to Tabatha's supplemental complaint, Lightning Rod had previously refused to intervene in the pending wrongful death and survivorship case, claiming "the allegations in the lawsuit do not trigger any duty to defend or indemnify." (Supp. Complaint Apr. 10, 2010).

-4-

excluded by the terms of the policy and therefore not covered. At this time, Lightning Rod also filed a counterclaim for a declaratory judgment requesting the trial court to find that there is no coverage for the wrongful death of Ivy under the policy.

{¶11} The case proceeded to the discovery phase. Several witnesses were deposed, including Dan, Tabatha and the people present on the night Ivy died—specifically, Heather Davies, John Grieshop, Sr., John Grieshop, Jr. ("JR"), and Mary Sheely, Ivy's grandmother. In addition, partial transcripts from the testimony given by Dan and Heather Davies at Dan's criminal trial were also filed as part of the record in this case.

{¶12} On September 27, 2010, Lightning Rod moved for summary judgment asserting that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Specifically, Lightning Rod argued that its liability for Ivy's wrongful death is excluded under the terms of its policy. Lightning Rod contended that Ivy was a resident of Dan's household and that claims by one resident of the household against another resident insured are excluded from liability coverage. Lightning Rod also argued that Dan's felony conviction for child endangering provided evidence that Dan's action of supplying alcohol to Ivy, which resulted in her death, was an intentional act triggering an exclusion from coverage under the policy. Finally, Lightning Rod maintained that

the policy only covered bodily injury, including death, that is caused as a result of an "occurrence," which under the policy language means an accident, and that Ivy's death was not caused by an accident.

{¶13} On September 30, 2010, Tabatha filed a motion for partial summary judgment arguing that Lightning Rod is required by law and under the terms of the policy to pay the $300,000.00 judgment against Dan, as its insured, and accordingly, requested the trial court to dismiss Lightning Rod's counterclaim for a declaratory judgment.

{¶14} On October 19, 2010, the trial court entered judgment granting Lightning Rod's motion for summary judgment, overruling Tabatha's motion for partial summary judgment, and declaring that there is no coverage for the wrongful death of Ivy Sheely under the policy. Specifically, the trial court concluded the following:

> **The alcohol was purchased for the child by [Dan] in Allen County, the alcohol was consumed by the child at the residence of a third party, the supplying of the alcohol was expected and intended to permit the child to consume alcohol illegally (with its attendant risks of harm and/or death), there is no "occurrence" under the definitions of the policy and applicable case law, the child was living with [Dan], her father, during a period of visitation with him as her non-residential parent pursuant to his parental rights and responsibilities, and therefore the claims are by a resident (through her representative) of the insured household against another resident of the same household and subject to the exclusion from liability, and the exclusion for intentional acts also applies.**

Case No. 2-10-38

(JE, Oct. 19, 2010).

{¶15} Tabatha subsequently filed this appeal, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR LIGHTNING ROD THROUGH ITS APPLICATION OF "INFERRED INTENT" ANALYSIS TO DETERMINE THERE WAS NO "OCCURRENCE" UNDER THE POLICY DEFINITIONS AS THE HARM SUFFERED IN [SIC] CANNOT BE DEEMED AN INHERENT RESULT OF THE INTENTIONAL ACT OF DAN SHEELY.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED IN GRANTING LIGHTNING ROD'S MOTION FOR SUMMARY JUDGMENT BECAUSE AT THE VERY LEAST A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER IVY SHEELY WAS A "RESIDENT" OF DAN SHEELY'S HOME AT THE TIME OF HER DEATH.**

*First Assignment of Error*

{¶16} In her first assignment of error, Tabatha argues that the trial court erred in granting Lightning Rod's motion for summary judgment. Specifically, Tabatha claims that Dan's conduct of furnishing alcohol to Ivy, which led to her death, is not subject to the intentional-act exclusion in his homeowner's policy issued by Lightning Rod. Rather, Tabatha maintains that Ivy's death is the result

-7-

of an "occurrence," which is covered under the personal liability provisions in the policy.

{¶17} Initially, we note that an appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991. A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); see *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196, 1995-Ohio-286, paragraph three of the syllabus.

{¶18} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to

summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ.R. 56(E).

{¶19} In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Additionally, Civ.R.56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

{¶20} "It is axiomatic that an insurance company is under no obligation to its insured, or to others harmed by the actions of an insured, unless the conduct alleged of the insured falls within the coverage of the policy." *Gearing v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 36, 665 N.E.2d 1115, 1996-Ohio-113. "Coverage is provided if the conduct falls within the scope of coverage defined in the policy, and not within an exception thereto." *Id.* Thus, the pertinent inquiry is whether Ivy's death from acute alcohol toxicity, which resulted from her drinking alcohol provided by Dan, is an insurable event under Lightning Rod's policy. Our

resolution of this case depends upon the policy language applicable to the present

facts.

**{¶21}** The policy language at issue provides:

**COVERAGE E – Personal Liability**

**If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:**

**(1)   Pay up to our limit of liability for the damages for which the "insured" is legally liable.   Damages include prejudgment interest awarded against the "insured;" and**

**(2)   Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.   Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.**

* * *

(Lightning Rod Policy for D. Sheely, at 15).

**DEFINITIONS**

* * * *

**1.    "Bodily Injury" means bodily harm, sickness or disease, including required care, loss of services and *death* that results."**

* * *

**3.    "Insured" means you and *residents of your household* who are:**

**(a) Your relatives; or**

**(b) Other persons under the age of 21 and in the care of any person named above.**

\* \* \*

**5.    "Occurrence"** *means an accident*, **including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in \* \* \***

**(a)    "Bodily Injury[.]"**

\* \* \*

(Lightning Rod Policy for D. Sheely, at 1-2) (Emphasis added).


**SECTION II- EXCLUSIONS**

**(1)    Coverage E-Personal Liability \* \* \* do(es) not apply to "bodily injury" or "property damage"**

**(a)    Which is expected or intended by the "insured[.]"**

(Lightning Rod Policy for D. Sheely, at 16).


\* \* \* \*

**(2)    Coverage E-Personal Liability, does not apply to:**

\* \* \*

**f.    "Bodily Injury" to you or an "insured" within the meaning of part a. or b. of "insured" as defined.**

(Lightning Rod Policy for D. Sheely, at 18).

{¶22} With the policy language in mind, we now turn to the undisputed facts deduced from the pleadings, depositions, answers to interrogatories, written admissions, affidavits and transcripts of evidence contained in the record.

{¶23} In his deposition for this case, Dan testified that for several months prior to Ivy's death, he permitted Ivy and her teenage friends to drink alcohol in his home. Dan recalled in his testimony at his criminal trial for child endangering, that he also supplied Ivy and her underage friend, Brittany Brand, with Tequila during a vacation in Florida on New Year's Eve of 2006. Nevertheless, other than this one instance, Dan maintained that the girls were only permitted to drink in his home and were not allowed to leave his home with the alcohol. Dan recalled that he never saw the girls drink straight liquor, but that he permitted them to make mixed drinks with the alcohol. He admitted that he would not be in the room with the girls because "they didn't want to be around [him]," but he would always be in the next room watching TV. (Tr. Feb. 12, 2008 at 10). Dan also admitted, however, that he did not caution Ivy against abusing alcohol.

{¶24} In her deposition for this case, Heather Davies, Ivy's friend, who was with her on the night she died, explained that in the months preceding Ivy's death, she and Ivy spent a significant amount of time together drinking alcohol. Heather recalled that every time they consumed alcohol it was at Dan's house, with the exception of the night that Ivy died. Heather testified that she and Ivy drove from

Findlay to Dan's house in St. Johns to drink alcohol at least a couple times a month. Specifically, Heather recalled that the drinking at Dan's began in November of 2006, occurring every "now and again." (Davies Depo., at 19). However, Heather admitted the trips to Dan's house from Findlay gradually increased in frequency during the months prior to Ivy's death in May of 2007. Heather explained that she and Ivy would stay at Dan's overnight for a day or two, usually over the weekend. Heather recalled that she drank at Dan's house with Ivy around fifteen different times.

{¶25} Heather and Ivy's friend, Brittany Brand, provided similar testimony in her deposition, stating that every time she went to St. Johns with Ivy, they drank alcohol at Dan's house. Brittany testified that she and Ivy made alcoholic mixed drinks in Dan's home with his knowledge. She recalled two occasions in which Dan took the girls to a liquor store to purchase alcohol for them. Brittany testified that there were times at Dan's house where she would be intoxicated to the point that she was unable to drive. Brittany remembered that Dan was always in his bedroom when the girls were consuming alcohol. Brittany testified that one night she was talking with Dan in his basement and he appeared "slightly drunk." (Brand Depo., at 57). She recalled Dan lamenting that he wished he was a better father to Ivy. Brittany provided the following testimony in her deposition for this case:

**Q: Do you think the fact that he allowed you girls to drink and party there at the house was any reflection on something he was attempting to do?**

**A: Yeah.**

**Q: What was that?**

**A: He wanted to be, I think psychologically, he wanted to be the best friend, the awesome uncle. And the only way a lot of people have tried to—and I think in his way, he wanted to have a relationship with his daughter in a cool way, and the only cool way would have been that way.**

**Q: What, to let her drink and party?**

**A: (Witness nodding). I believe so, yes.**

**Q: When you were down there at Dan's house, did you ever see Ivy and Dan really interact a whole lot together?**

**A: He would take us out to eat, but that's really all that was much interaction. He'll come out of [his] room sometimes, but that was pretty much it.**

(Brand Depo., at 57-58).

{¶26} Turning back to the night of Ivy's death, Dan adamantly maintained that he did not know Ivy left his home with the bottle of Vodka. Dan recalled that earlier that evening, he went out to dinner with Ivy, her friend, Heather Davies, and his brother and sister-in-law. After dinner, Ivy, Heather and Dan went to a liquor store to purchase a bottle of Vodka, at Ivy's request. Dan explained that the Vodka was not intended just for Ivy's use, but that it was supposed to be the house

-14-

supply. Dan stated that he regularly kept alcohol in the house for visitors to consume, including Ivy and her friends. Dan testified that the alcohol was always accessible and that Ivy knew he kept it on the top of the refrigerator. Dan recalled that he usually kept four or five bottles of liquor in the house.

{¶27} Ivy, Heather and Dan were in Dan's car when they drove to the store to purchase the Vodka. Ivy was driving, Dan was in the front passenger seat and Heather was in the backseat. Dan admitted that this was not the first time he purchased alcohol for the girls to consume at his house, and that he had done so a "few times" on previous occasions. (Tr. Feb. 12, 2008 at 21). On this night, Dan purchased a large bottle, over a liter, of 80-proof Vodka, at Ivy's request, and a beer for Heather.[2] In her testimony at Dan's criminal trial, Heather recalled that she and Ivy left the Vodka in the back of the car when they arrived to Dan's house and went into the house to freshen up their hair and make-up.

{¶28} Heather testified that about ten minutes later they drove down the street to the Grieshop's trailer, where they intended to consume alcohol. Once they arrived to the Grieshop's, Ivy opened the full bottle of Vodka and began to drink it. Heather testified that Ivy started drinking the Vodka by doing a couple of

---

[2] Heather provided testimony at Dan's criminal trial that, while at the liquor store, Dan was initially given a smaller, 40-proof bottle of Vodka by the clerk, but Ivy objected to purchasing that bottle, expressing she wanted a larger bottle and a higher proof of alcohol. When deposed for this civil case, Heather testified that Ivy told Dan that night that she wanted to get "really, really drunk. That was her obvious intention, she made that obvious." (Davies Depo. at 57). However, Dan did not admit to these facts. Accordingly, in our review, we have not considered this testimony and instead have relied only on testimony which is undisputed in evaluating the trial court's decision to grant summary judgment.

shots and then began to swig it. Heather remembered that Ivy had left the trailer at one point and when she returned, Heather noticed that much of the alcohol in the bottle was gone. Heather stated that shortly after that point, Ivy became extremely incoherent and unable to stand-up. Heather recalled that she gave Ivy a pillow and helped her lay down on the floor. Heather then went back into the kitchen to converse with JR Grieshop. Heather testified that when she went to check on Ivy, it was obvious something was seriously wrong.

{¶29} John Grieshop, Sr., the owner of the trailer where Ivy died, testified that he recalled Heather and Ivy coming to the house that night. Grieshop stated that he warned Ivy two or three times that night about the reckless manner in which she was drinking the Vodka, specifically, that she was "putting it down a little bit too heavy." (Grieshop, Sr. Depo., at 18). He recalled that each time he said something to her, Ivy would respond to him by saying, "My dad said I could drink." (Grieshop, Sr. Depo., at 18). John, Sr., testified that shortly thereafter Ivy had passed out on the couch and then fell on the floor. He remembered that she began to make some strange noises and told his son, JR, to fetch Dan. Ivy subsequently died from acute alcohol toxicity.

{¶30} The trial court found that Ivy's death was not an insurable event under the policy because it was not the result of an "occurrence" and that the intentional-act exclusion applied. On appeal, Tabatha argues that the trial court

-16-

erred in its application of the doctrine of inferred intent when it found that the intentional-act provision in the policy excluded from coverage Dan's conduct of supplying his daughter with alcohol.[3]

{¶31} We note that since the trial court's decision granting summary judgment in favor of Lightning Rod, the Supreme Court of Ohio issued its decision, *Allstate Insurance Company v. Campbell*, 128 Ohio St.3d 186, 942 N.E.2d 1090, 2010-Ohio-6312, which clarifies the application of the doctrine of inferred intent to an insurance policy's intentional-act exclusion.

{¶32} After reviewing its prior cases on the subject, the Court in *Campbell* concluded the following:

> **It is clear that as applied to an insurance policy's intentional-act exclusion, the doctrine of inferred intent applies only in cases in which the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm. Limiting the scope of the doctrine is appropriate because the rule is needed only in a narrow range of cases—those in which the insured's testimony on harmful intent is irrelevant because the intentional act could not have been done without causing harm. Thus, an insured's intent to cause injury or damage may be inferred only when that harm is intrinsically tied to the act of the insured—i.e., the action necessitates the harm.**

*Campbell*, 128 Ohio St.3d at 1097-98.

---

[3] The doctrine of inferred intent is based on the principle that the insured's commission of a particular, deliberate act may, as a matter of law, give rise to an inference of intent—i.e., that the insured intended to cause the resulting harm. Until recently, the Supreme Court of Ohio had only applied the doctrine in cases involving murder and sexual molestation of a minor, and had not enunciated a clear standard for the courts to apply the doctrine in other circumstances.

{¶33} In the instant case, we cannot say that there is no genuine issue of material fact as to whether Dan's act of furnishing alcohol to Ivy and her death are intrinsically tied so as to infer as a matter of law that Dan's conduct necessarily resulted in Ivy's death. Dan testified that he was unaware Ivy took the bottle of Vodka to the neighbor's house on the night she died. He was adamant in his testimony that he would only allow Ivy and her underage friends to drink in his house while he was there; something he had allowed on several prior occasions without causing bodily injury or death. Thus, it cannot be said in this instance that Dan's act of furnishing alcohol to Ivy necessitated her death as a matter of law. For instance, even on the night in question there are numerous other possibilities that could have occurred as a result of Dan's conduct of supplying Ivy alcohol besides her death. Therefore, based upon the Supreme Court's enunciation of the doctrine of inferred intent in *Campbell*, we cannot conclude that Lightning Rod's intentional-act exclusion is applicable as a matter of law to Dan's conduct of supplying alcohol to his minor child.

{¶34} However, just because a parent, who has furnished alcohol to a minor child on several prior occasions without causing bodily injury or death, might not be found in a particular case to have intentionally caused a death, does not mean that bodily injury or death is an unexpected or unforeseeable result of such conduct within the meaning of an accidental "occurrence" provision. Thus,

notwithstanding our conclusion as to the intentional-act exclusion, we must still resolve the issue of whether Ivy's death was caused by an "occurrence" and is, therefore, covered under the terms of Lightning Rod's policy. The policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in * * * "Bodily Injury[.]" (Lightning Rod Policy for D. Sheely, at 2). Notably, the word "accident" is not defined in the policy.

{¶35} Under Ohio law, when a term in an insurance contract is not defined by the policy, the term is to be given its ordinary meaning. *Black v. Richards*, 5th Dist. Nos. 08 CA 19, 09 CA 4, 09 CA 12, 09 CA 13, 2010-Ohio-2938, ¶ 49, citing *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.* (C.A.6 1993), 990 F.2d 865, 872. "The ordinary meaning of the term 'accident' in an insurance policy refers to 'unintended' or 'unexpected' happenings." *Morner v. Giuliano*, 167 Ohio App.3d 785, 2006-Ohio-2943, 857 N.E.2d 602, ¶ 25. Moreover, the Ohio Supreme Court has stated that the word "occurrence" when defined as "an accident" is "intended to mean just that-an unexpected, unforeseeable event." *Randolf v. Grange Mut. Cas. Co.* (1979), 57 Ohio St.2d 25, 29, 385 N.E.2d 1305.

{¶36} After reviewing the record before us, it is our determination that there is no genuine issue of material fact upon which reasonable minds could conclude that Ivy's death was an unexpected, unforeseeable event in these

circumstances, falling within the category of an "occurrence" under Lightning Rod's policy. It is undisputed that Dan knowingly engaged in a repeated pattern of conduct over several months in which he permitted his sixteen-year-old-daughter and her minor friends to consume alcohol in his home. It is also undisputed that in all those instances Dan provided his daughter and her friends the alcohol by either purchasing it for them, or by furnishing an array of liquor in his home for their use. By his own admission, Dan was not present in the room with the teenagers while they consumed the alcohol, but rather he remained in the next room for the vast majority of the time. Dan also admitted that even though he permitted Ivy to consume liquor, he never cautioned her against alcohol abuse. Furthermore, Dan does not dispute that, on the night of Ivy's death, he purchased a large bottle of 80-proof Vodka, at her request, and that her consumption of the liquor resulted in her dying from acute alcohol toxicity.

{¶37} Moreover, even though our review of Ohio case law did not reveal a case which addressed this precise issue, other jurisdictions have determined that the unintended harm resulting from an adult furnishing alcohol to a minor is not an "occurrence" covered by an insurance policy, where an "occurrence" is defined as an "accident," as in this case. See e.g., *American Modern Home Ins. Co. v. Corra* (2008), 222 W. Va. 797, 671 S.E.2d 802 (holding that "absent policy language to the contrary, a homeowner's insurance policy defining 'occurrence' as 'an

accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in bodily injury or property damage,' does not provide coverage where the injury or damage is allegedly caused by the homeowner's conduct in knowingly permitting an underage adult to consume alcoholic beverages on the homeowner's property"); *Allstate Ins. Co. v. J.J.M.* (2002), 254 Mich. App. 418, 657 N.W.2d 181 (concluding that injuries to a minor who was raped while at party in homeowner's residence where alcohol was served to minors were not an "occurrence" within meaning of homeowner's policy, where the homeowner reasonably should have expected that giving minors enough alcohol to allow them to pass out would result in harm; the fact that specific harm that occurred was intentional act of rape rather than alcohol poisoning was irrelevant to determination whether occurrence was an accident); *Illinois Farmer's Ins. Co. v. Duffy* (Minn., 2000), 618 N.W.2d 613 (finding that the insureds' supplying of alcohol to teenagers at a party was not an "occurrence" within meaning of the homeowner's insurance policy, for purposes of determining insurer's obligation to defend or indemnify insureds in negligence action to recover for injuries subsequently sustained by teenagers in automobile accident, as wrongful or tortious acts on part of insureds in providing the minors with alcohol were not accidental).

{¶38} Based on the foregoing, we conclude that Ivy's death from acute alcohol toxicity as a result of her consuming liquor furnished to her by Dan cannot be classified as an accident within the meaning of the insurance policy in this case. As a result, Ivy's death is not an insurable event as an "occurrence" under Dan's homeowner's policy with Lightning Rod.

{¶39} Based on the record, we find that there is no genuine issue as to any material fact, that Lightning Rod is entitled to judgment as a matter of law, and that reasonable minds can come to but one conclusion and that conclusion is adverse to Tabatha, as the non-moving party. Accordingly, we conclude that the trial court did not err in granting summary judgment in favor of Lightning Rod and determining that there is no coverage for Ivy's wrongful death under the insurance policy at issue. Tabatha's first assignment of error is, therefore, overruled.

### *Second Assignment of Error*

{¶1} In her second assignment of error, Tabatha argues that the trial court erred in granting summary judgment in favor of Lightning Rod because there remained a genuine issue of material fact as to whether Ivy was a resident of Dan's household at the time of her death. Under the terms of the personal liability provisions of the policy, Lightning Rod is liable for covering bodily injury caused by an "occurrence." Having found that Ivy's death was not caused by an "occurrence," we do not need to address whether Ivy was a resident under Dan's

insurance policy and therefore subject to the residential exclusion from coverage. Tabatha's second assignment of error is rendered moot and is therefore overruled.

{¶2} For all these reasons, the judgment of the Auglaize County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**PRESTON, J., concurs.**

**WILLAMOWSK, J., concurs in Judgment Only.**

**/jlr**